Dusian Alfred **KRIVOSKI**

v.

The **UNITED STATES.**

No. 234–52.

United States Court of Claims.

Oct. 2, 1956.

Writ of Certiorari Denied
Dec. 17, 1956.
See 77 S.Ct. 326.

Frederick Bernays Wiener, Washington, D. C., for plaintiff.

Francis X. Daly, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

Plaintiff, a veteran of World War II, was in December 1945 released to inactive service. He remained an officer in the Reserve Corps until February 9, 1948, when he reenlisted in the grade of technical sergeant. On August 10, 1948, he was recalled to active duty as a first lieutenant, Finance Department, Army of the United States, and in 1949 was sent overseas.

Plaintiff was convicted in a court-martial proceeding and given a sentence of confinement at hard labor for 2 years (later reduced to 1 year) and dismissed from the service. He alleges that the court-martial proceeding was void on the ground that he was deprived of the right to be represented by disinterested counsel in violation of the Sixth Amendment to the Constitution, and that he was denied due process of law in violation of the Fifth Amendment.

The facts are clearly stated in the findings filed with this opinion.

In August 1950 plaintiff was on duty at the Army Finance Center at Friedberg, Germany. The commanding officer and central disbursing officer was Col. Samuel J. Taggart. Subordinate to him were Capt. Willard E. Finley who commanded the finance detachment of about 35 enlisted men, and the plaintiff who was deputy disbursing officer.

As such deputy plaintiff had access to the vault, including keys to all parts of it, as well as to safes in the finance center. The vault had a corridor and four rooms, three of which had doors into the corridor; the fourth was an annex room and could be reached only through one of the corridor rooms.

Both military and civilian personnel stationed in Germany at that time were paid in military certificates. It was necessary from time to time to withdraw these certificates for destruction. On the particular occasion involved herein about $478,000 of such certificates were to be destroyed.

Three officers were designated as a committee to supervise the destruction of the certificates. Captain Finley was one of this committee. The committee met with plaintiff on August 3, 1950, and went with him to the vault to count the certificates which were in the annex room. After counting, the certificates were placed in foot lockers in the annex room. The committee and plaintiff then went to lunch, the plan being to complete the destruction during the afternoon.

Prior to this particular time Captain Finley had on several occasions suggested to the plaintiff that the latter should purloin a bundle of the currency for their own use from the supply that was periodically withdrawn and destroyed. Just before the committee went to lunch on August 3, 1950, Captain Finley telephoned the plaintiff to come to his office and there repeated the suggestion and said this would be a good opportunity to take a package of currency to be divided between them.

Before the committee reconvened plaintiff returned to the annex room, took a bundle of certificates with a face value of $9,900 out of the foot locker and placed it in a metal cashier's box that was in the corridor room of the vault. He then went out to witness the burning.

Later that afternoon Colonel Taggart had occasion to go into the corridor room of the vault, noticed the cashier's box therein, brought it upstairs and found the certificates inside. Meanwhile, plaintiff had become disturbed and when he heard that Colonel Taggart had brought the box upstairs, sought him out and told him everything he had done. This was the first intimation Colonel Taggart had of the facts. Plaintiff also told Colonel Taggart that Captain Finley had originally suggested some 8 months previously that some of the certificates be withheld from these periodical destructions, the proceeds to be divided between them, and that Captain Finley had repeated this suggestion on numerous occasions. Captain Finley denied the charges.

Both Captain Finley and plaintiff were placed under arrest and were subjected to court-martial procedure. Two charges

were made against plaintiff and four against Captain Finley, two of which are not relevant here. These are set out in finding 9.

Prior to the trial the case against Captain Finley set out in Charge II was dismissed, but he was tried on the other three charges. The remaining charges included conspiracy to commit larceny and the commission of theft in conjunction with the plaintiff.

Plaintiff was the principal witness against Captain Finley. Plaintiff did not claim his privilege against incrimination, although he was reminded of his rights.

The appointed military defense counsel at the general court-martial proceeding was Capt. Roy H. Adams, Infantry, a member of the bar of the Supreme Court of Texas. Captain Finley, however, was principally defended by Milton J. Teiger, an American lawyer practicing in Germany, who was selected by the accused. Mr. Teiger and Captain Adams worked together at the trial of Captain Finley.

At the close of the prosecution's evidence Mr. Teiger moved for a finding of not guilty with respect to Charge IV, the theft charge, on the ground that the plaintiff herein, Krivoski, "is confessing to a crime he never committed." After argument the motion was denied. Captain Finley did not testify. He was found guilty and sentenced "to be dismissed the service, to forfeit all pay and allowances * * * and to be confined at hard labor * * * for five years."

Later the same day the charges against plaintiff were referred for pretrial investigation pursuant to Article of War 46(b).* The investigation took place on October 6, 1950. Captain Adams, who had previously represented Captain Finley, appeared at the pretrial investigation at the direction of the staff judge advocate and offered his services to plaintiff as defense counsel, offering in the alternative to secure other services for plaintiff if the latter preferred. Plaintiff stated that he had no objection to being represented by Captain Adams in the pretrial investigation. At the conclusion of the pretrial investigation plaintiff gave Captain Adams several names including that of Major Shelton Gaddis, whom he wanted to appear at the trial as character witnesses in his behalf. No definite appointment of defense counsel was made at this time, and it was tacitly understood that Captain Adams would protect the plaintiff's interests until the question of defense counsel could be resolved. Plaintiff understood that he had the option of being represented by Adams or some other person. He expressed no preference, apparently gave no serious thought to the matter, did not dissent to being represented by Adams and expected him to represent him.

At the trial Charge I was stricken and Charge II was the basis of the trial. At the trial Captain Adams was named as defense counsel to defend the plaintiff.

Lt. Col. Julian E. Weisler, the staff judge advocate, recommended that the general court-martial be composed of others than those who heard the case of Captain Finley. He was familiar with the facts involved in the action against plaintiff, but he did not consider that Captain Adams was disqualified by any conflict of interest from representing the plaintiff. Captain Adams had been a regularly appointed defense counsel in many cases at this particular post.

During the period from August 7 until October 6, 1950, the plaintiff made no effort to obtain counsel, civil or military, and prior to the date of the trial had neither requested nor been refused counsel. Plaintiff had three conferences with Captain Adams after the pretrial investigation and before the trial. At one of these conferences there was a discussion covering the elements of the offense charged and whether the prosecution could prove them, and also a discussion as to how to plead. Decision on the latter point was left open. Although Captain Adams explained to the plaintiff that the ultimate decision as to how to plead would be

---

\* Now 50 U.S.C.A. § 603.

made by plaintiff, he replied that he would be bound by Captain Adams' advice. Plaintiff evidently thought he had committed an offense of some description, was reconciled to a dismissal from the service, and was primarily concerned with avoiding imprisonment.

Captain Adams finally advised that plaintiff plead guilty. The plaintiff acquiesced, the thought being that such a plea might induce clemency from the reviewing authorities.

The prosecution called four witnesses, including Colonel Taggart, and introduced the statement that plaintiff had made on August 7, 1950, and which is referred to in finding 8. The defense called Colonel Taggart, Maj. Shelton Gaddis, Lieutenant Hays and two enlisted men as character witnesses. Plaintiff also testified. He was not asked any questions to elicit what he had told Colonel Taggart and the Finley court-martial to the effect that Captain Finley had repeatedly importuned him to take the certificates, although these facts were recited in plaintiff's written statements of August 7, 1950, which statement was a part of the record before the court-martial.

Plaintiff was found guilty and was sentenced to be dismissed, to forfeit all pay and allowances, and to be confined at hard labor for two years.

Lieutenant Colonel Weisler, the staff judge advocate, recommended in writing on October 24, 1950, approval of the findings and sentence, but stated in that connection that without the testimony and cooperation of the accused a conviction could not have been obtained in the case of Captain Finley.

On October 25, 1950, Captain Adams submitted to the commanding officer of the military post a clemency letter on plaintiff's behalf, recommending that the portion of the sentence extending to confinement be suspended. He gave several reasons as set out in finding 23. The facts set forth in this letter were not presented to the court-martial before plaintiff was sentenced and the letter itself was not submitted by Captain Adams until the day after the action of the reviewing authority set out in finding 22.

The respective records of the trials in the two court-martial cases were presented to the office of the Judge Advocate General of the United States Army. Captain Finley retained as appeal counsel Thomas H. King of Washington, D. C. Plaintiff also sought to retain Mr. King and sent him a copy of his record of trial and also a retainer. Mr. King declined to represent plaintiff because of his apprehension of a possible conflict of interest in plaintiff's case and that of Captain Finley, essentially because plaintiff implicated Captain Finley and the latter denied having importuned plaintiff to take the bundle of military certificates. Mr. King transmitted plaintiff's record of trial and the full remittance to plaintiff's present counsel.

The plaintiff earnestly insists that at and before the trial by court-martial he was denied the effective assistance of counsel in violation of the Sixth Amendment because he was furnished with counsel who had previously represented a conflicting interest, and that as a consequence the defense of the plaintiff was perfunctory and inadequate. The plaintiff relies upon this court's decision in the case of Shapiro v. United States, 69 F.Supp. 205, 107 Ct.Cl. 650. However, in that case the plaintiff was being tried by court-martial on the charge that he had delayed the orderly progress of a general court-martial when he was acting as attorney for the defense in another court-martial trial. It seems that in the previous trial he was representing an American soldier of Mexican descent who was charged with assault with attempt to rape. The defendant in that case vigorously maintained that it was not he who committed the assault. Shapiro, who was counsel for the defendant in the assault case, in order to demonstrate a mistake in identity, had substituted for the accused another American soldier of Mexican descent. The substitute soldier was convicted, whereupon Shapiro informed the court of the deception he had prac-

ticed. Shapiro then in turn was tried by general court-martial because of such deception. Shapiro was notified at 12:40 p. m. September 3, 1943, that he would be tried at 2:00 p. m. on that same day at Kearney, Nebraska, 35 to 40 miles from the place where the charges had been served on him. Plaintiff had selected Capt. James J. Mayfield to represent him but this officer was named in the order preferring the charges as the Trial Judge Advocate. Plaintiff therefore at 12:40 was put to the necessity of procuring other counsel to represent him. He selected two lieutenants, neither of them being a lawyer. When the court convened he moved for a continuance of 7 days on the ground that his counsel had not had sufficient time to prepare a defense. The motion was denied and he was put to trial. At 5:30 that afternoon he was convicted and sentenced to be dismissed from the service. The court held in that case that it was a flagrant case of military despotism against a defendant who at most had merely demonstrated the fallibility of the judgment of his superior officers and made them look ridiculous, and that it was a complete denial of plaintiff's constitutional rights; that his rights had been denied when counsel had been refused an opportunity to prepare his defense, and that the entire procedure showed denial of plaintiff's rights under the Fifth and Sixth Amendments.

The facts in that case were completely different from and far stronger than in the case at bar.

The plaintiff also cites the case of Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680. In that case counsel was appointed to represent plaintiff along with the co-defendant over the objection of plaintiff. It was a case in which notice was given to the judge that the interests might be inconsistent and where the counsel for defense of one defendant might be less effective than if he had represented the defendant alone. ▮ In the case at bar the plaintiff accepted the appointment of counsel without protest, the cases were tried separately, the plaintiff's counsel did not rep-

resent Captain Finley on appeal, and full time was given for the preparation of the case. The court-martial was duly constituted, had jurisdiction of the person accused and of the offense charged, and we do not think it was subject to collateral attack or judicial review. Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508; Hiatt v. Brown, 339 U.S. 103, 70 S.Ct. 495, 94 L.Ed. 691.

Plaintiff's case was briefed and argued by plaintiff's counsel in the present case before the Judicial Council which, on March 12, 1951, recommended that plaintiff's confinement be reduced to one year. The Judge Advocate General concurred and the sentence was accordingly reduced to one year; otherwise plaintiff's conviction and sentence were approved. No doubt the present counsel, who is skilled in such matters, fully presented all the facts of the case before the Judicial Council.

We quote from the case of Burns v. Wilson, supra [346 U.S. 137, 73 S.Ct. 1047], as follows:

"Military law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment. This Court has played no role in its development; we have exerted no supervisory power over the courts which enforce it; the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers [of the Constitution] expressly entrusted that task to Congress."

We think that in all the circumstances the plaintiff's sentence might well have been further reduced. However, the fact remains that he took the $9,900 with the intent of appropriating it to his own use and that of Captain Finley, and while there are some mitigating circumstances, he, by his own confession, which was voluntarily made, admitted that this was his purpose. He decided to make a full

disclosure only after he found that Colonel Taggart, the commanding officer, had discovered the military certificates which had been taken by him and placed in a cashier's box to which he had the key.

■ Since we are not a reviewing court, we are not permitted to pass upon errors or mistakes in judgment unless they are so flagrant as to make the action of a regularly formulated military tribunal null and void, or to deprive it of jurisdiction once it has been regularly constituted.

■ We do not think the facts of this case justify such action on the part of this court as would result in a judgment for the full pay and allowances from the time of the court-martial proceedings as a continuing claim.

The petition is dismissed.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges, concur.

### Findings of Fact

The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:

1. Plaintiff is a citizen of the United States and of the State of Illinois, residing in Chicago. He has been married since February 1946 and has three children. There is no evidence as to when the children were born.

2. Plaintiff enlisted in the United States Army on August 14, 1940, served in the ranks until commissioned on October 27, 1943, as a second lieutenant, Finance Department, was promoted to first lieutenant on July 1, 1944, and served overseas in World War II, receiving three battle stars. He was separated from active duty on December 28, 1945.

After World War II he remained in the Reserve Corps, and on February 13, 1947, was promoted to the grade of captain, Finance Department Reserve. On February 9, 1948, he reenlisted in the grade of technical sergeant and served on active duty in that grade, after which, on August 10, 1948, he was recalled to active duty as a first lieutenant, Finance Department, Army of the United States. On August 2, 1949, he was once more sent overseas.

3. In August 1950 plaintiff was on duty at the 7752nd Army Finance Center, Friedberg, Germany. The commanding officer and central disbursing officer of that installation was Colonel Samuel J. Taggart. Subordinate to him were Captain Willard E. Finley, who commanded the Finance Detachment of about 35 enlisted men, and the plaintiff, who was deputy disbursing officer.

As such deputy, plaintiff had full and untrammeled access to the vault, and had keys to all parts thereof with an exception here immaterial, as well as to all safes in the finance center. The vault had a corridor and four rooms, three of which were reached from the corridor, and the last was an annex that could only be reached from one of the corridor rooms.

4. Military and civilian personnel of the United States Forces stationed in Germany at this time were paid only in military payment certificates. These certificates were periodically withdrawn from circulation and, after counting, were destroyed at the finance center. On August 3, 1950, an experiment was scheduled to be conducted to determine feasible means of destruction of the certificates in the event that a withdrawal of American forces became necessary. Approximately $478,000 worth of military payment certificates were to be destroyed on this occasion.

5. The commanding officer, Frankfurt Military Post, appointed a committee of three officers in connection with this scheduled experimental destruction, consisting of a Major Jones, Lieutenant Hayes, and the Captain Finley referred to in finding 3. This committee met the plaintiff on August 3, 1950, and went with him into the vault to count the certificates. The certificates were in the annex room, from which they were taken into the adjoining corridor room where

the committee worked. When the committee's work was completed, all of the certificates had been taken from the corridor room and placed in footlockers in the annex room. At this juncture the committee, accompanied by the plaintiff, went out to lunch, and the scheduled destruction of the certificates was accomplished in the afternoon.

6. For some months prior to August 1950, Captain Finley had on numerous occasions suggested to the plaintiff that the latter should purloin a bundle of currency for their own use from the mutilated currency that was periodically destroyed. Before the committee went to lunch on August 3, 1950, Captain Finley telephoned the plaintiff to come to his office and there repeated the suggestion and, after lunch, while the boxes containing the counted currency were being carried out for destruction, Captain Finley again said that this would be a good opportunity to take a package of currency.

Before the committee reconvened plaintiff returned to the annex room, took a bundle of certificates with a face value of $9,900 out of a footlocker, and placed that bundle in a metal cashier's box that was in the corridor room of the vault. Thereafter he went out to witness the burning. Later that afternoon Colonel Taggart had occasion to go into the corridor room of the vault, noticed the cashier's box therein, brought it upstairs and, upon opening it, found the certificates inside. Plaintiff had meanwhile become apprehensive about his actions and, when he heard that Colonel Taggart had brought the box up, sought him out and told him everything he had done. This was the first inkling Colonel Taggart had had of the facts, as there were several innocent explanations for the presence of the certificates in the cashier's box.

7. That afternoon and again the following morning Colonel Taggart talked to both the plaintiff and to Captain Finley.

The plaintiff told Colonel Taggart that it was Captain Finley who had originally suggested, some eight months previously, that he take some of the certificates scheduled for destruction on the occasions of the periodic destructions, and that the proceeds of such taking be divided between them. The plaintiff further told Colonel Taggart that Captain Finley had repeated this suggestion on numerous occasions, the last one at noon of this same day.

Captain Finley told Colonel Taggart that he had been wrongfully accused by the plaintiff. He also said that he was afraid the plaintiff would take the certificates, that he almost asked to be relieved from membership on the committee in consequence of that fear, and that he was afraid that, if Colonel Taggart had not found the certificates, plaintiff would not have divided with him.

8. On August 4, 1950, plaintiff was barred from further access to the vault and was directed to surrender his keys. Three days later, on August 7, 1950, both he and Captain Finley were placed in arrest in their respective quarters in Friedberg until further notice. On the same day the plaintiff made a full and complete written statement to agents of the Army's Criminal Investigation Division, incriminating himself and implicating Captain Finley, setting forth what he had done and what Captain Finley had asked him to do substantially to the same effect as he had previously related the facts to Colonel Taggart. The CID agents had warned plaintiff in advance of his rights and read to him the 24th Article of War.

9. On August 11, 1950, Colonel Taggart preferred charges against both plaintiff and Captain Finley, as follows:

The charges against the plaintiff were these:

"Charge I: Violation of the 96th Article of War.

"Specification: In that First Lieutenant Dusian A Krivoski, FD, 7752 Finance Center, did, at Friedberg, Germany, on or about 1 October 1949, conspire with Captain Willard E Finley, 7752 Finance Center, to commit an offense against the United States, to wit: larceny, by

stealing Military Payment Certificates intended for destruction as mutilated currency, and that the said First Lieutenant Dusian A Krivoski did, for the purpose of effecting the object of said conspiracy, feloniously steal one package of mutilated Military Payment Certificates in the total amount of nine thousand, nine hundred and ninety dollars ($9,990.-00).

"Charge II: Violation of the 93d Article of War.

"Specification: In that First Lieutenant Dusian A Krivoski, FD, 7752 Finance Center, in conjunction with Captain Willard E Finley, 7752 Finance Center, did, at Friedberg, Germany, on or about 3 August 1950, feloniously steal nine thousand, nine hundred and ninety dollars ($9,900.-00) in Military Payment Certificates, the property of the United States."

The charges against Captain Finley were these:

Charge I involved two specifications alleging violations of the 94th Article of War in connection with a motion picture projector, not relevant here.

Charge II involved one specification alleging a violation of the 95th Article of War, not relevant here.

The remaining charges against Captain Finley were:

"Charge III: Violation of the 96th Article of War.

"Specification: In that Captain Willard E Finley, Inf, 7752 Finance Center, did, at Friedberg, Germany, on or about 1 October 1949, conspire with First Lieutenant Dusian A. Krivoski, 7752 Finance Center, to commit an offense against the United States, to wit: larceny, by stealing Military Payment Certificates intended for destruction as mutilated currency, and that the said First Lieutenant Dusian A Krivoski did, for the purpose of effecting the object of said conspiracy, feloniously

steal one package of mutilated Military Payment Certificates in the total amount of nine thousand, nine hundred and ninety dollars ($9,990.-00).

"Charge IV: Violation of the 93d Article of War.

"Specification: In that Captain Willard E Finley, Inf, 7752 Finance Center, in conjunction with First Lieutenant Dusian A Krivoski, 7752 Finance Center, did, at Friedberg, Germany, on or about 3 August 1950, feloniously steal nine thousand, nine hundred and ninety dollars ($9,990.-00), in Military Payment Certificates, the property of the United States."

The charges against the plaintiff and Charges III and IV against Captain Finley involved the identical package of military payment certificates.

All references to the Articles of War in this report are to those in effect during 1950 and through May 30, 1951, namely, those enacted by the act of June 4, 1920, as amended by Title II of the act of June 24, 1948, 10 U.S.C., Supp. II to 1946 ed., secs. 1471–1593.†

10. On August 18, 1950, the charges against Captain Finley were investigated as required by Article of War 46(b) and paragraph 35a of the Manual for Courts-Martial.

Thereafter those charges, the report of the investigating officer, and the allied papers were referred to the staff judge advocate for advice in pursuance of Article of War 47(b) and paragraph 35b of the Manual. Included in the allied papers were the statement made by the plaintiff to agents of the Army's Criminal Investigation Division referred to in finding 8, and a statement by Colonel Taggart setting forth in detail the substance of the facts set out in finding 7. Included in the report of the investigating officer was testimony by the plaintiff and by Colonel Taggart to the same effect.

On August 29, 1950, the Staff Judge Advocate, Lieutenant Colonel Julian E.

† Now 50 U.S.C.A. § 551 et seq.

Weisler, recommended that the charges against Captain Finley be referred for trial to a general court-martial. On the same day they were so referred by order of the commanding officer, Frankfurt Military Post, to a general court-martial appointed by said officer. Lieutenant Colonel Weisler contemplated that the prosecution would use the plaintiff as a witness against Captain Finley, and so indicated in his letter of advice.

All references in this report to the Manual for Courts-Martial are to the Manual for Courts-Martial, U. S. Army, 1949, Ex. Order Dec. 7, 1948, 10020, 13 Fed.Reg. 7519, which was in force during 1950 and through May 30, 1951.

All references to military personnel in this report indicate the rank held by such personnel at the time referred to.

11. The trial judge advocate of the general court-martial to which the charges against Captain Finley were referred was Major James E. Atkins, Jr. He died before this case was heard. The appointed military defense counsel of that general court-martial was Captain Roy H. Adams, Infantry, a member of the bar of the Supreme Court of Texas. Captain Finley was principally defended, however, by Milton J. Teiger, Esq., an American lawyer practicing in Germany, as individual counsel selected by the accused. Mr. Teiger also died before this case was heard.

12. The charges against the plaintiff had not been formally investigated or referred for trial at this time but were held in abeyance on orders of the commanding officer, Frankfurt Military Post. Plaintiff meanwhile was still in arrest in quarters. He had not been told that he would or would not be tried. No charges had been served on him.

Early in September, while in such arrest, plaintiff was visited by Captain Adams who, as the regularly appointed defense counsel for Captain Finley, was interviewing all witnesses in the Finley case. Plaintiff was listed as a prosecution witness on the Finley charge sheet. Captain Adams told the plaintiff that, under the provisions of the 24th Article of War, he was not required to incriminate himself in any testimony he might give at the Finley trial. Notwithstanding this advice, plaintiff still believed he had no other choice in the matter that would meet the compulsion of his conscience, and told Captain Adams that he would testify. Plaintiff is a person of normal intelligence capable under normal circumstances of understanding the advice given him by Captain Adams and others.

13. Because of postponements requested by Mr. Teiger, the trial of Captain Finley did not commence until September 28, 1950. Both Mr. Teiger and Captain Adams were present to represent Captain Finley. All three, Finley, Adams, and Teiger, cooperated in presenting the accused's defense, although the pretrial cooperation between Adams and Teiger was spasmodic. At trial they functioned as a team with mutual respect for each other, with Teiger assuming the active role as defense counsel. Captain Adams was prepared to assume the defense of Captain Finley in the event that Mr. Teiger were to withdraw or could not be present. Captain Adams represented Captain Finley with undivided loyalty, as required by the Manual.

14. Prior to the trial, a *nolle prosequi* had been entered by the convening authority as to Charge II against Captain Finley. He was arraigned on the remaining charges and specifications and, through Mr. Teiger, pleaded not guilty to all of them. Plaintiff was the principal witness against Captain Finley in respect of Charges III and IV and, except as to some admissions by Finley testified to by Colonel Taggart, was the only witness directly connecting Captain Finley with the military payment certificate transactions alleged in said Charges III and IV. Plaintiff did not claim his privilege against self-incrimination in respect of his testimony concerning those transactions, although he was reminded of his rights. The matters set forth in findings 3 to 7 were presented in detail. At the close of the prosecution's evidence, Mr. Teiger moved for findings of not guilty

with respect to Charge IV, pursuant to paragraph 72a of the Manual, essentially because Krivoski "is confessing to a crime he never committed". Captain Adams heard this motion argued; it was denied. Captain Finley did not testify concerning the transactions alleged in Charges III and IV. At the close of all the testimony the court-martial found Captain Finley guilty of all charges and specifications and sentenced him "to be dismissed the service, to forfeit all pay and allowances to become due after the date of the order directing execution of the sentence, and to be confined at hard labor * * * for five years".

15. Captain Finley's court-martial adjourned at 12:10 a. m., on October 3, 1950. Later that day the charges against plaintiff were referred for pretrial investigation pursuant to Article of War 46(b) and paragraph 35a of the Manual and, on October 6, 1950, the investigation took place. Captain Adams, who had previously represented Captain Finley, appeared at the pretrial investigation at the direction of the staff judge advocate and offered his services to plaintiff as defense counsel, offering in the alternative to secure other services for plaintiff if the latter preferred. Plaintiff said he had no objection to being represented by Captain Adams at the pretrial investigation and the latter did so. Plaintiff made no statement at the investigation pursuant to advice from Captain Adams.

At the conclusion of the pretrial investigation plaintiff gave Captain Adams the names of several persons, including a Major Shelton Gaddis, whom he wanted to appear at trial as character witnesses

in his behalf.[1] No definite appointment of defense counsel was made by plaintiff at this time, and it was tacitly understood that Captain Adams would protect the plaintiff's interests until the question of defense counsel could be resolved. It was optional in plaintiff's mind whether he was defended by Adams or some other person. He expressed no preference, gave no serious thought to the matter, had no conscious dissent to being represented by Adams, and expected Adams to represent him.

16. The charges against the plaintiff, the allied papers, and the report of investigation were referred to Lieutenant Colonel Weisler, the staff judge advocate. This officer recommended that Charge I be stricken, and that Charge II be referred for trial. The charges as thus amended were accordingly referred for trial on October 11, 1950, to a general court-martial appointed by the commanding officer, Frankfurt Military Post and, on the following day, a copy of the charges was formally served on the accused.

On Lieutenant Colonel Weisler's recommendation, the charges against plaintiff were referred to a general court-martial composed of members other than those who heard the case of Captain Finley, because Lieutenant Colonel Weisler considered that such prior connection disqualified them. A different law member was also appointed. Major Atkins, who had prosecuted Captain Finley as trial judge advocate, was named as trial judge advocate to prosecute the plaintiff, and Captain Adams was named as defense counsel to defend the plaintiff. Lieutenant Colonel Weisler was familiar with

1. A sharp conflict exists on this point. Plaintiff testified that, on October 6, 1951, he told Adams that he wanted to be represented by Major Gaddis, an officer then on duty in Austria, that when Adams asked him if Gaddis was a lawyer he replied he thought not, whereupon Adams advised that defense counsel was required to be a lawyer. As a result plaintiff testified, in effect, to a relinquishment of the thought of being represented by Gaddis, although later he learned that Gaddis was to appear as a

character witness. On the other hand, Captain Adams testified that plaintiff never expressed a desire to be defended by Gaddis, but suggested his name solely as a character witness. On the balance of the evidence, the inconclusiveness of plaintiff's recollections on the subject, and his failure to communicate with Gaddis although having opportunities to do so, it is reasonable to conclude that plaintiff is mistaken in his recollection.

the facts involved in the actions against plaintiff and Captain Finley as they were reflected in the papers accompanying the charges against the latter, but he did not consider that Captain Adams was disqualified by any conflict of interest from representing the plaintiff. Captain Adams had been a regularly appointed defense counsel in many cases at Frankfurt Military Post. Lieutenant Colonel Weisler made no effort to recommend the appointment as defense counsel of any officer not connected with the Finley case because the existence of a possible conflict of interest did not occur to him.

17. Plaintiff had been in arrest in quarters since August 7, 1950. Until attending the pretrial conference on October 6, 1950, he had not been specifically informed that any charges against himself had been sworn to, or that he would be tried. Between these dates plaintiff made no effort to obtain counsel, civil or military. The staff judge advocate's office had not provided him with counsel before October 6, and plaintiff had neither requested nor been refused counsel.

The terms of plaintiff's arrest in quarters were set forth in a written communication which has been lost. However, while under such arrest, plaintiff was permitted to leave for haircuts periodically, and there is no evidence that he was denied the privilege of having visitors or the use of the telephone in his home.

18. On October 6 plaintiff discussed with Captain Adams the question of retaining civilian counsel. Captain Adams advised against it because civilian counsel might antagonize the court-martial, as had occurred in the Finley trial. This advice was an exercise of Captain Adams' best judgment and there is no showing that it was not motivated in the best interests of the plaintiff or was not sound under the circumstances prevailing.

In all, plaintiff had three conferences with Captain Adams after the pretrial investigation and before the trial. The first took place in Captain Adams' car driving from Frankfurt back to Fried-berg after the pretrial investigation on October 6, 1950, and consisted of generalizations. The second took place on October 16 and lasted about three hours. On that occasion there was discussion covering the elements of the offense charged and whether the prosecution could prove them, and also discussion as to how to plead. Decision on the latter point was left open. Captain Adams explained to plaintiff the effect of the available ways to plead and told him that the ultimate choice was the plaintiff's. The plaintiff indicated he would be bound by Captain Adams' advice. Although lacking a professional appreciation of the legal requirements to prove the crime charged, plaintiff clearly thought he had committed an offense of some description. He was mentally reconciled to a dismissal from the service as a punishment and at that time was concerned primarily with avoiding imprisonment. He depended on the advice of counsel to select the alternative that would best serve the desired result. The third conference took place a few minutes before the trial convened.

19. Captain Adams' final decision to plead the plaintiff guilty, in which plaintiff acquiesced, was made as he was walking into the courtroom on the day of trial. At this time he told the plaintiff that he would plead him guilty in order to obtain clemency from the reviewing authority. This was their third and last pretrial conference.

Prior to the trial, Captain Adams had discussed with Lieutenant Colonel Weisler, the staff judge advocate, the question of clemency if the plaintiff pleaded guilty. Weisler stated that he would hold out no assurances as it was the policy of the reviewing authority not to make any deals. Prior to the trial, likewise, Captain Adams had considered but rejected the possibility, permissible under military practice, of entering on plaintiff's behalf a plea of guilty to the lesser included offense of an attempt in violation of the 96th Article of War. Captain Adams had discussed this with plaintiff, who was content to rest on the judgment of his counsel.

250

20. The general court-martial referred to in finding 16 proceeded to the trial of the plaintiff on October 19, 1950. Captain Adams appeared as counsel for the plaintiff and was accepted by him as such. Neither side challenged any member, either peremptorily or for cause. Captain Adams pleaded plaintiff guilty to the specification and the charge. Before accepting the plea the law member explained to plaintiff his rights and the meaning of the plea and plaintiff persisted therein.

The prosecution called four witnesses, including Colonel Taggart, and introduced the statement that the plaintiff had made to agents of the Criminal Investigation Division on August 7, 1950, which is referred to in finding 8. The defense called Colonel Taggart, Major Shelton Gaddis, Lieutenant Hayes, and two enlisted men as character witnesses. Plaintiff took the stand to testify to his personal and military background. He was not asked any questions to elicit what he had told Colonel Taggart, the Criminal Investigation Division, and the Finley court-martial, namely, that Captain Finley had repeatedly importuned him to take the certificates, although these facts were recited in plaintiff's written statement of August 7, 1950, which statement was part of the record before the court-martial.

Plaintiff was found guilty, and was sentenced "to be dismissed the service, to forfeit all pay and allowances to become due after the date of the order directing execution of the sentence, and to be confined at hard labor * * * for two years". The court-martial then adjourned.

21. If, in legal contemplation, a conflict of interest existed between the positions of Captain Finley and the plaintiff so as to disqualify Captain Adams to represent the plaintiff after previously representing Captain Finley, this conflict did not occur to Captain Adams or to the staff judge advocate or to plaintiff, was not explained by Captain Adams or the staff judge advocate to plaintiff, did not cause Captain Adams or the staff

judge advocate to explain to plaintiff specifically that he had rights to the assistance of counsel untainted by prior loyalties to a conflicting interest, and did not consciously affect Captain Adams in his defense of plaintiff. It is reasonable to conclude that Captain Adams' defense of plaintiff would have been the same as that which actually transpired even if he had not previously represented Captain Finley.

22. Lieutenant Colonel Weisler, the staff judge advocate, acting pursuant to paragraph 87b of the Manual and Article of War 47(c), recommended in writing on October 24, 1950, approval of findings and sentence, saying as to the latter aspect:

"The cooperation of the accused in testifying at the trial of Captain Willard E Finley resulted in a conviction of Captain Finley including confinement at hard labor for a period of five (5) years. Without the testimony and cooperation of the accused a conviction could not have been obtained in the case of Captain Finley. In view of the maximum sentence which could have been imposed it is not considered at this time that the term to confinement be mitigated."

Plaintiff's sentence was accordingly approved in its entirety on October 24, 1950, by Brigadier General Basil H. Perry (formerly Colonel), U. S. Army, commanding officer, Frankfurt Military Post, and the record was forwarded for appellate action pursuant to Article of War 48.

23. On October 25, 1950, Captain Adams submitted to the commanding officer, Frankfurt Military Post, a clemency letter on plaintiff's behalf recommending that the portion of the sentence extending to confinement be suspended. In that letter, Captain Adams made these points: (a) Plaintiff made full confession to Colonel Taggart before the latter suspected any wrongdoing. (b) Plaintiff's confession to the Criminal Investigation Division showed that he did not possess any inherent criminal ten-

dencies. (c) Plaintiff yielded to solicitations and encouragement from a senior officer. (d) Plaintiff materially aided the military authorities by testifying against such officer, waiving his own right against self-incrimination. (e) Plaintiff cooperated with the military authorities at the risk of his own liberty. (f) "The money involved in this case was discovered while it was still in the vault, and therefore under the control of the Army authorities. As a result, the government suffered no loss of funds."

These matters set forth in the foregoing letter were not presented to the court-martial after it found the plaintiff guilty and before it adjudged his sentence. The letter itself was not submitted by Captain Adams until one day after the action of the reviewing authority referred to in finding 22, and so was not available for consideration by the reviewing authority.

24. On October 30, 1950, Lieutenant Colonel Weisler completed his review of Captain Finley's record of trial. He held it legally sufficient and, with respect to sentence, advised the reviewing authority as follows:

"Lt. Krivoski has been tried for his participation in the larceny of the money involved in this case. Upon a plea of guilty the court before which his case was tried imposed a sentence of Dismissal, total forfeiture and confinement at hard labor for two years. The reviewing authority approved this sentence in its entirety and the case has been forwarded to the Office of The Judge Advocate General pursuant to Article of War 48. It is believed that the 5 years confinement imposed in this case appears to be somewhat disproportionate to the sentence imposed in the Krivoski case inasmuch as the two officers involved are equally involved in the offenses charged against them of which they have been found guilty. However, there is to be considered in this case the offense involving the larceny and disposition of the projector and sound equipment which justifies, in my opinion, a more severe sentence in the case of Capt Finley. Accordingly, it is recommended that the sentence in this case be approved but that the confinement at hard labor be reduced to three years.
* * * "

On October 31, 1950, Captain Finley's sentence was accordingly approved by General Perry who, however, reduced the period of confinement to three years, as recommended, and forwarded the record under the 48th Article of War.

25. Captain Finley and the plaintiff were severally confined upon the announcement of their respective sentences and, in due course, were transferred to confinement facilities at Fort Jay, Governors Island, New York. Their respective records of trial meanwhile reached the Office of The Judge Advocate General, United States Army. Captain Finley retained as appellate counsel Thomas H. King, Esq., of Washington, D. C. Plaintiff also sought to retain Mr. King and sent him a copy of his record of trial and a retainer.

On November 30, 1950, Mr. King declined the plaintiff's representation because of his apprehension of a possible conflict of interest between plaintiff's case and that of Captain Finley, essentially because plaintiff implicated Finley and the latter denied having importuned plaintiff. Mr. King accordingly transmitted plaintiff's record of trial and the full remittance, without any deduction or forwarding fee, to plaintiff's present counsel.

This was the first intimation plaintiff had from any source that Captain Adams' representation of both Captain Finley and the plaintiff involved a possible conflict of interest.

26. Present counsel for the plaintiff argued and briefed plaintiff's case before a Board of Review in the Office of The Judge Advocate General of the Army which, on December 14, 1950, affirmed plaintiff's conviction.

Thereafter, plaintiff's counsel wrote The Judge Advocate General on Decem-

ber 20, 1950, requesting that he be furnished with the case review made by the staff judge advocate and the opinion of the Board of Review, which documents were wanted in order to prepare a presentation to the Judicial Council before which the case was then pending. The Judge Advocate General denied the request on December 27.

27. The opinion of the Board of Review referred to in finding 26 is reported at 12 BR–JC 81. That opinion has never been classified in any way and copies of the volume in which it appears are on the open shelves of the Department of Justice and of The Judge Advocate General's Section of the Army Library. Anyone with access to those libraries was free to use the volume.

The review of the staff judge advocate referred to in finding 24 has never been classified for security reasons in any way. It was first made available to plaintiff's counsel at the hearing before the commissioner in October 1954 and was admitted as a plaintiff's exhibit. The review of the staff judge advocate in the Finley case is similarly not classified. That document was included in the record of trial in the Finley case which was produced in response to a call and is an exhibit in this case.

28. Plaintiff's case was argued and briefed before the Judicial Council which, on March 12, 1951, confirmed plaintiff's conviction but recommended that the confinement be reduced to one year. On March 19, 1951, The Judge Advocate General concurred in that action and reduced the confinement accordingly. These further appellate proceedings are reported at 12 BR–JC 87 and 95.

Plaintiff's dismissal from the Army was announced in General Court-Martial Orders No. 35, Department of the Army, 1951, as effective from midnight, March 30, 1951.

Plaintiff remained in confinement until July 2, 1951, at which time he was released on parole. His parole expired on August 18, 1951.

29. A petition for new trial pursuant to Article of War 53, as reenacted by section 12 of the act of May 5, 1950, 50 U.S.C.A. §§ 660, 740, was filed on plaintiff's behalf on October 2, 1951. On December 11, 1951, oral argument thereon was held before The Judge Advocate General who, on January 2, 1952, denied said petition.

30. The facts presented in this report were available and presented to the military authorities reviewing plaintiff's successive applications.

31. Since his release from confinement, plaintiff has earned the following sums in civilian employment: 1951, $1,028.35; 1952, $3,685.61; 1953, $4,194.08. His earnings in 1954 were at the rate of $82.50 weekly, plus overtime of from $37 to $40 per week. In 1952 he made a profit of $404.62, and in 1953 one of $158.40 from a store which he and his wife operated jointly.

