Robert G. GALLAGHER

v.

The UNITED STATES.

No. 386–67.

United States Court of Claims.

April 17, 1970.

Richard A. Baenen, Washington, D. C., attorney of record for plaintiff. Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

Bruno A. Ristau, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This action is before us on cross motions for summary judgment, with extensive documentation. It is a soldier's suit for back pay lost by reason of a court-martial conviction. He urges that the court-martial lacked jurisdiction and that it denied him his constitutional right to representation by counsel.

The plaintiff, a Private First Class in an armored division was stationed in Germany. German police arrested him and another soldier, one Hughes, on suspicion of having assaulted and robbed a German civilian, while they were in Bad Nauheim, on leave and wearing civilian clothes. According to established procedure in such cases, the police turned the suspects over to Army agents, and the court-martial followed. After considering the record and the briefs and oral arguments of counsel, we hold that the court-martial had jurisdiction and that it did not deny plaintiff representation by counsel, but that the skill of such counsel and the correctness of all his measures are not issues that are properly before us under the finality language of the Uniform Code of Military Justice, 10 U.S.C. § 876 (1964), which reads as follows:

The appellate review of records of trial provided by this chapter, the proceedings, findings, and sentences of courts-martial as approved, reviewed, or affirmed as required by this chapter, and all dismissals and discharges carried into execution under sentences by courts-martial following approval, review, or affirmation as required by this chapter, are final and conclusive. Orders publishing the proceedings of courts-martial and all action taken pursuant to those proceedings are binding upon all departments, courts, agencies, and officers of the United States, sub-

ject only to action upon a petition for a new trial as provided in section 873 of this title (article 73) and to action by the Secretary concerned as provided in section 874 of this title (article 74), and the authority of the President.

We wish to express appreciation for the diligence of counsel in putting before us material which aids us greatly in reaching an informed and understanding decision in this important case.

### I.

■ The issue of the court-martial's jurisdiction becomes important in view of a recent Supreme Court decision, O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), holding that the military court system lacked jurisdiction to try a soldier for a sex crime against a civilian committed, while the soldier was off duty and out of uniform, in Hawaii, then a United States Territory, now one of the 50 states. A military trial, the Court held, would violate the soldier's constitutional right to a jury trial. Plaintiff naturally points out that he, too, was off duty and out of uniform, and he, too, was accused of attacking a civilian. Defendant says that the alleged crime here was committed in Germany, a foreign sovereign country, a distinction so significant that O'Callahan loses all authority. We agree.

The Court of Military Appeals has held in a group of recent cases that the jurisdiction of courts-martial over offenses by United States military personnel committed in foreign countries remains after O'Callahan as it was. United States v. Higgenbotham, 19 U.S.C.M.A. 73, 41 C.M.R. 73; United States v. Keaton, 19 U.S.C.M.A. 64, 41 C.M.R. 64; United States v. Stevenson, 19 U.S.C.M.A. 69, 41 C.M.R. 69; United States v. Easter, 19 U.S.C.M.A. 68, 41 C.M.R. 68 (all decided November 14, 1969). Of these cases, the Keaton opinion sets forth the views of the court more fully, and may be regarded as speaking on all four cases. Easter and Higgenbotham, however, are closest to Gallagher's case on the facts. Easter was charged with attempted housebreaking in a civilian community in Germany. Higgenbotham was charged with unpremeditated murder of a German national in a civilian establishment. The court in both cases states that authority to try the accused was granted under Article VII of the NATO Status of Forces Agreement and Article XIX of the Supplementary Agreement, and that in view of the occurrence of the offenses in the civilian community, waivers of jurisdiction by the German authorities were obtained. Counsel herein state that a standing waiver was in effect at the time of Gallagher's arrest. In the "lead" Keaton case the victim was another United States serviceman, which might have been seized upon as "service connection," but the court, as we read it, considers that inquiry into "service connection" is irrelevant in case of a violent crime in a friendly foreign country with which we have a Status of Forces Agreement. Whether this is so or not it would seem that "service connection" would always be present in such a case. One of our armed forces which disinterested itself in the commission of crimes of violence against local civilians by our servicemen in friendly foreign countries would surely soon find its ability to perform its mission gravely impaired. For that reason, there is no logical distinction on the ground of "service connection" between an attack on a local civilian and one on a fellow soldier. In O'Callahan a total lack of "service connection" was assumed as true in the order granting certiorari.

Defendant has aided us with an extended and enlightening exposition of the complex of treaties that establish the jurisdiction to try our soldiers, sailors and airmen for offenses they may be charged with committing while stationed in friendly foreign territory. Chief Justice Marshall laid down the applicable ground rules of international law many years ago in The Schooner Exchange v. M'Faddon, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). If a foreign military contingent enters a friendly host country, presumptively the sending country retains juris-

diction over the contingent and the host country acquires none. But the contingent can be there at all only with the host's consent and the host which could exclude entirely can condition admission or retention with whatever stipulations it pleases as to jurisdiction, and can change these, of course, at will on proper notice. The treaties involved, therefore, seek to provide arrangements covering jurisdiction which will be mutually fair and just and enjoy some stability during the life of the cold-war situation that, of course, occasions our forces being abroad at all.

As to Germany, defendant says the basic agreement is the NATO Status of Forces Agreement of June 19, 1951, TIAS 2846, 4 U.S.T. 1792, to which the Federal Republic of Germany acceded by TIAS 5351, 14 U.S.T. 531. The Agreements divide offenses by soldiers into three general categories. Those punishable only by the law of the sending state are dealt with by that state. Those punishable only by the law of the receiving state are dealt with by the receiving state. Those punishable by the laws of both states are deemed concurrent, and with excepions not here pertinent, the receiving state has "primary" jurisdiction in such cases, which it may waive if requested, as it did here.

That the United States can constitutionally waive jurisdiction over its servicemen in foreign countries under such agreements is settled in Wilson v. Girard, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957). That the offense, robbery, of which Gallagher was accused, is of the concurrent class, we may assume. If the court-martial were held not to have jurisdiction, and no other American tribunal having it should appear, the result we presume could be expected to be either that Germany would no longer waive, or else she might claim the offense was no longer in the concurrent class. In either event the result would be the same: future Gallaghers would be tried in the local German courts under the provisions of German criminal law.

Thus it appears that plaintiff is asking us to exhibit our zeal for the Bill of Rights by holding that the protection of our Bill of Rights must be utterly withdrawn from servicemen stationed in foreign countries, whenever they are charged with offenses in the concurrent class. We say this, of course, not meaning to raise any hobgoblins about Germany, which has a highly developed system of jurisprudence, with its own system of safeguarding the accused. But we may notice judicially that our servicemen are stationed also in other countries, some of which have a reputation for harsh laws and savagely operated penal institutions. We are supposed to do this to defend the jury system, but counsel are unable to advise that jury trials are accorded to persons tried even under Germany's enlightened criminal statutes.

It may be suggested that the Congress could legislate for domestic jury trials in Article III courts, for servicemen accused of crimes of violence against civilians in friendly foreign countries. We note that the Court of Military Appeals challenges this supposition and raises a doubt whether it is true in its *Keaton* opinion.

On the hypothesis that the "service connection" of the offense had been rejected, it would appear that a statutory attempt to confer on Article III Federal courts, (or state courts), jurisdiction over the trial of crimes of violence committed against foreign nationals on the streets of foreign cities would encounter very serious problems of constitutional law and international law. *Cf.* International Longshoremen's Local 1416 v. Ariadne Shipping Co., 397 U.S. 195, 90 S.Ct. 872, 25 L.Ed.2d 218 (decided March 9, 1970), and cases cited. Supposing the legislative draftsmen found answers to all of these, there would still be no assurance that foreign police would surrender custody of offenders actually in their hands on the expectation that they would be tried thousands of miles away, under a statute that would appear as a gross invasion of their national sovereignty, and possibly ineffective too. How could the

testimony of eye witnesses be obtained? We think it unnecessary to go into these matters further because we think the grounds of our holding already stated are sufficient without entirely resolving them.

Thus we hold the court-martial had jurisdiction.

## II.

In consideration of the other alleged wrong relied on, the denial of representation by counsel, a proper understanding of the issue must begin with a fairly detailed statement of the facts and evidence in the case.

After plaintiff and the other suspect, Hughes, were turned over by the German police, who had arrested them, to the C.I. D., they were given a chance, in plaintiff's case, to sober up, as he was quite drunk, and to confer together alone. Then, after warnings whose sufficiency is not in issue here, they gave statements, from which, afterwards, they never varied substantially. An Art. 32 investigation was had and a JAG officer, a Captain Sullivan, was appointed to defend both soldiers. Gallagher could have had another officer had he wished, but apparently it did not occur then or until long after the trial, to anyone, that there might be any conflict which would prevent Captain Sullivan from defending both with equal loyalty.

Captain Sullivan thought the case against Gallagher was weaker than that against Hughes, and to avoid prejudice to Gallagher, he should have a separate trial. To assure this, he demanded on Gallagher's behalf but not Hughes' that the court include enlisted men. This had its intended effect. A court composed of officers only was appointed to try Hughes, and a wholly separate one with enlisted men included was named to try Gallagher. Plaintiff says here that any knowledgeable person would have been aware that, in that theater, a court-martial including enlisted men was always harder on the accused than one made up of officers only. The Court of

Military Appeals may possibly know this, but we certainly do not, and the point illustrates the detailed understanding of military criminal practice that civilian courts would need if they were to exercise the kind of review plaintiff desires.

The charge against both men was robbery. Hughes's trial occurred first. The court was, in Captain Sullivan's eyes lenient, finding Hughes guilty only of the lesser included offense of larceny. We do not have the transcript of that trial, but apparently the evidence was much the same as in Gallagher's trial that followed. Of course, there remained to be accomplished the review by the convening authority of the legality of the trial and the propriety of the sentence. Hughes's fate, as plaintiff rightly urges, was unsettled, and counsel's duties towards him were not all fulfilled.

That same day, in the afternoon, Gallagher's trial followed. It is important to note that the charge against Gallagher was that *"in conjunction with"* Hughes (emphasis supplied) he stole a wallet by force and violence from the person of one Bajanz, the complaining witness. Gallagher pleaded not guilty of robbery but guilty of the lesser included offense of unlawfully striking Bajanz on the head with his fists.

Bajanz was the first witness. He was a German national. Through an interpreter he testified that he was returning home after a few drinks at various restaurants and that two English speaking persons in civilian clothes knocked him down and then took his wallet which was buttoned in his right rear pocket. He felt them, or one of them, search his pockets and take it. He could not see them because of the loss of his glasses and because it was so dark at the time, and so could not recognize his assailant.

C.I.D. Warrant Officer Griffin testified that he interviewed Bajanz and saw he was very badly beaten up. Gallagher he said always maintained he had been too drunk to know about the larceny. The two men had been picked up by the German police and suspected by them to

be the assailants because both were bloodstained and Gallagher had cuts on his knuckles.

The prosecution rested. The defense put on several witnesses who showed how heavily Gallagher had been drinking. They all, but Hughes, had left him before the affray. Hughes, who stayed with him, said he (Hughes) tapered off his drinking and was more sober, while Gallagher kept right on. As, in their pub-crawling, they were walking towards the Grand Hotel, Gallagher dropped behind trying to throw up. Hughes walked ahead. He met a German who passed him by and then he heard the German say something and Gallagher say something. He turned around and Gallagher had already knocked the German down. He ran back to try to stop him. Gallagher was trying to help the German up. Gallagher threw Hughes off. Hughes noticed a wallet two feet from the German and picked it up. They ran to the next block. (The wallet apparently was a combined change purse and bill fold.) He removed some small coins from the purse but found the bill fold empty. He threw it away and kept going. Gallagher didn't know he was taking it, never told him to, and never discussed robbing anyone. Hughes did this entirely on his own. He stated as a "positive fact" Gallagher didn't know it when he picked up the wallet. He could make this statement "Because of the expression, of the way he acted when I told him." [After the arrest.] But they did run away together. Questioned by the court, he said it was not so dark he could not see the wallet on the ground.

Gallagher testified on his own behalf. He remembered having words with the German, hitting him, being grabbed by Hughes, and running away. He first learned of the wallet at the conference he had with Hughes while in custody, but they did not agree on stories then. He was sober enough to strike a blow, and to run. He didn't understand what the German said and could not explain why he hit him. He did try to help him up.

The prosecution argued that it was unnecessary to decide who took the wallet from Bajanz's pocket if the court found the two men were acting in conjunction. The law officer instructed, among other things, that the court could find that Gallagher if guilty committed the robbery either in conjunction with Hughes, or not in conjunction. If they found the former, with the other elements, they could find guilty as charged. If they found the latter, they would have to make a modified finding. Since they found guilty as charged, it seems clear they must have believed it to be immaterial who took the wallet from Bajanz's pocket, or whether it just popped out in course of the fracas.

After conviction on the robbery charge, and sentence, plaintiff, with new counsel before the Board of Review, laid great stress on the failure of Captain Sullivan to call character witnesses. This counsel endeavored to contradict and impeach Sullivan's explanation, which was that he had interviewed several possible witnesses and came to the belief that any sworn encomiums on Gallagher's character would be at best lukewarm, while the prosecution could neutralize it with opposing testimony. On direct appeal from court-martial convictions, the adequacy of representation of accused soldiers by appointed counsel is often gone into. E. g. United States v. McMahan, 6 U.S.C.M.A. 709, 21 C.M.R. 31 (1956). We can assume this was a proper issue to put before the Board of Review. But that Board affirmed and the Court of Military Appeals declined to grant review. Certainly the use of character witnesses may boomerang under some circumstances and the question whether such circumstances existed was for the sound judgment of trial counsel, or it could reasonably have been so held. Suppose we thought that Captain Sullivan made a mistake and should have called character witnesses, it was a mistake only and the point fails before us under the finality language as an independent ground for decision. It has weight only

as aggravating the alleged constitutional denial presently to be discussed.

The heaviest guns plaintiff has are directed at the unhappy Captain Sullivan for his having defendant Gallagher notwithstanding an alleged conflict of interest with his duty to defend Hughes. As we have said, nobody thought of this at the time and Gallagher could have had other counsel if he had wished. The two accused were good friends and would not have wanted, it would appear, to have the defense of either man incriminate the other. The prosecution, in fact, argued that they had obviously agreed on stories in the interval allowed them while in custody, such as to divide the elements of the robbery between them in a way that the entire crime could not be attributed to either man. Astute defense counsel would be aware of the same possibility and would realize the danger in probing too deeply into either man's story.

Plaintiff's present counsel says that an attorney for Gallagher, independent of Hughes, would have cross-examined Hughes with a view of getting him to admit that he took the wallet out of Bajanz's pocket. Hughes testified that Gallagher did not touch the wallet and did not know that Hughes had it. If believed, this would have secured Gallagher acquittal of robbery. If counsel got Hughes to admit he took the wallet directly out of Bajanz's pocket, conviction might still ensue if the court thought as it did that the two offenders were acting in concert and then the admission would be worthless. By probing for it, counsel would endanger all the testimony that seemed to help so much. Captain Sullivan says that the possibility of trying to further incriminate Hughes, as a means of defending Gallagher, never would have occurred to an assigned counsel in his right mind in that theater.

One thing we may be sure of: if Captain Sullivan (as counsel for Gallagher alone) had done what it is now said he should have, and if it had turned out badly, the outcry against Captain Sullivan would have been equally as great as it now is. The whole setup seem unfortunate and well calculated to assure that assigned defense counsel will never dare take the bold and imaginative steps by which paid defense counsel so often achieve the effects they do.

We assume that denying an accused soldier the right to counsel denies him a constitutional right. Shapiro v. United States, 69 F.Supp. 205, 107 Ct. Cl. 650 (1947), and further that assigning counsel with a conflict of interest is constitutionally equivalent to denying counsel. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The fact still remains, unless the mere assertion of a conflict of interest is to be constitutionally the equivalent of its actuality, someone must determine if the conflict is real or based on speculations too remote for any substantial influence on decisions. The presumption of propriety of official acts obliges us to suppose that those concerned intended Gallagher to be defended by counsel who would be able to give him undivided loyalty. The facts giving rise to the alleged conflict being as apparent as they ever became from the statements of Gallagher and Hughes to the C.I.D., long before the trials, we must further suppose, nothing to the contrary appearing, that the asserted conflict of interest was then deemed insubstantial so far as it was adverted to at all. The Board of Review necessarily determined, in its turn, though without opinion, that the conflict was insubstantial. We think such determinations are in an area where a tribunal which daily reviews court-martials might be hoped to have better antennae for the imponderable and the unspoken than we would.

The Supreme Court's decision reversing ours, in United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed. 2d 537 (1969), is for careful consideration here. When the case was before us, we thought we saw the denial of a constitutional right in that law enforcement officers had taped a statement by the principal witness against Augenblick, a

court-martial accused, but the tape had disappeared and could not be produced. We held that the constitution required the utmost effort to produce it, and the clearest possible explanation as to what had happened could it not be produced. In preliminary proceedings; the United States failed to produce a witness who was apparently the last person known to have had the tape. We saw this as not the amount of effort the constitution required. The Supreme Court held that whether this person should have been produced was a question that did not "rise to a constitutional level" p. 356, 89 S.Ct. 528. We understand this to mean that constitutional issues triable by us do not necessarily arise when a military tribunal that fully acknowledges a constitutional right takes measures it deems in good faith sufficient to implement it, as to which the opinions of others may differ. Whatever else the Congress intended by the finality language, its purpose to rely wholly on the expertise of the military tribunals to defend the serviceman's rights in such an instance was clear to the Supreme Court. There is nothing in the denial-of-counsel issues posed here to differentiate them from the tape issue in *Augenblick*. Indeed, this case is weaker in constitutional appeal than *Augenblick* and even absent the reversal, we might have distinguished it from our holding in *Augenblick* that was reversed.

Krivoski v. United States, 145 F.Supp. 239, 136 Ct.Cl. 451, cert. denied, 352 U.S. 954, 77 S.Ct. 326, 1 L.Ed.2d 243 (1956), involved a claimed denial of the right to counsel to a soldier convicted before a court-martial. The alleged denial resulted, just as here, from the representation of two accused by the same assigned defense counsel, in separate trials. The possibility of conflicting duties of defense counsel was, it would seem, more real than here, for the accused there told conflicting stories and incriminated each other. This court, in an opinion by former Chief Judge Jones, discussed the classic denial-of-counsel case in this court, Shapiro v. United States, *supra*,

but reached a contrary result. We said at 145 F.Supp. 244, 136 Ct.Cl. 459:

\* \* \* \* \* \*

Since we are not a reviewing court, we are not permitted to pass upon errors or mistakes in judgment unless they are so flagrant as to make the action of a regularly formulated military tribunal null and void, or to deprive it of jurisdiction once it has been regularly constituted.

\* \* \* \* \* \*

We think that case remains a valid precedent on its facts, though in view of all the water that has flowed under the bridge since 1956, and all the variegated attempts to define the scope of collateral review of court-martial convictions that have ensued, we do not attempt to determine whether we would now define the limits exactly as stated there. The inapplicability of finality language to that case is not a factor weakening its effect as a citation by defendant here.

We have also considered United States v. Lovett, 7 U.S.C.M.A. 704, 23 C.M.R. 168 (1957); United States v. Faylor, 9 U.S.C.M.A. 547, 26 C.M.R. 327 (1958); and United States v. Young, 10 U.S.C. M.A. 97, 27 C.M.R. 171 (1959). All three involved alleged conflicts of interest in the representation of a pair of accused by the same assigned defense counsel in courts-martial, and in the first two cases the convictions were reversed on that ground, but the conflicts were far more substantial and palpable than they are here. In *Lovett*, the other man was a prosecution witness. In *Faylor*, counsel told the court on behalf of the other man that Faylor was the ringleader. It does not appear from these cases that the Court of Military Appeals would sweep a real conflict of interest under any rug. It regards it, as we do, as raising a constitutional problem. But neither is it willing to conjure up imaginary and hypothetical conflicts, of a nature that would effectively preclude the same defense counsel from ever representing two or more co-defendants. See *Lovett, supra*, at p. 707. We would suppose that

co-defendants, who are cooperating, and not seeking to exculpate themselves by incriminating one another, would often derive advantages from sharing counsel in common which it would be unjust to take away. Yet the rule urged on us here would have that effect, because even the expressed wish of defendants to be represented in common would have to be disregarded.

■■ We do not attempt to decide whether Hughes and Gallagher here should have had separate defense counsel. We only say that the mistake, if there was one "did not rise to a constitutional level" in the language of *Augenblick*, and was at worst an error or mistake in judgment, not flagrant, in the *Krivoski* terms. We think the finality language of the statute means, with whatever else, that the military tribunals must be allowed a reasonable scope for the exercise of judgment in deciding just how much is necessary to be done to effectuate a constitutional right they are aware of and manifestly respect, such as the right to the effective assistance of counsel. What we might do in a flagrant case, beyond reasonable difference of opinion, such as *Shapiro*, we can decide when such a case comes before us.

Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted, and the petition is dismissed.