UNITED STATES of America ex rel.
John W. FLEMINGS, Appellee,

v.

John H. CHAFEE, Secretary of the
Navy, Appellant.

No. 528, Docket 71–1997.

United States Court of Appeals,
Second Circuit.

Argued Feb. 29, 1972.

Decided March 28, 1972.
Certiorari Granted June 19, 1972.
See 92 S.Ct. 2461.

James C. Hair, Jr., Atty. Dept. of Justice (L. Patrick Gray, III, Asst. Atty. Gen., Robert A. Morse, U. S. Atty. for Eastern District of New York, Walter

H. Fleischer, Atty. Dept. of Justice, of counsel), for appellant.

Michael Meltsner, New York City, for appellee.

Before KAUFMAN, MANSFIELD and OAKES, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Toward the end of its 1968 Term, the Supreme Court virtually sounded the death knell for court-martial jurisdiction which had been exercised over certain cases for more than fifty years. O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), decided that the Armed Services had no power to try servicemen for alleged crimes or offenses triable in civilian courts and which were without substantial military significance or "service connection." We are now asked to decide whether O'Callahan, which itself overturned a final conviction, applies retroactively to another court-martial conviction for a non-service connected offense which became final prior to June 2, 1969, the date of that decision.[1]

John W. Flemings, in 1944 an eighteen-year-old seaman second class in the United States Naval Reserve stationed at the Naval Ammunition Depot in Earle, New Jersey, failed to return to his base after a seventy-two-hour leave. While AWOL, he was arrested for auto theft near Hollidaysburg, Pennsylvania, by Pennsylvania State Troopers who discovered him in an automobile which had been stolen the previous day in Trenton, New Jersey. The victim of the theft was a member of the United States Signal Corps who lived away from the naval base. The car was his personal property, he was on a purely personal errand in Trenton when the car was stolen, and at no time was he reimbursed by the military for any expenses incurred in the operation of the automobile. After being apprehended by the State Troopers, Flemings was transferred to military custody and incarcerated at Harts Island, New York. A court-martial subsequently was convened at the Brooklyn Navy Yard, the specification charging him with being AWOL for thirteen days and stealing an automobile "from the possession of a civilian." On the advice of military "counsel", he pleaded guilty and was sentenced to incarceration for three years, loss of his pay and a dishonorable discharge.[2]

In the wake of O'Callahan and long after the completion of his prison sentence,[3] Flemings now seeks to have his conviction vacated and his discharge changed to honorable, contending that the auto theft was not service connected and thus not a proper basis for court-martial jurisdiction. This action was brought in the Eastern District of New York.[4] Judge Weinstein, in a carefully

1. The Supreme Court in Relford v. Commandant, 397 U.S. 934, 90 S.Ct. 958, 25 L.Ed.2d 114 (1970), granted certiorari specifically to consider the issue raised here. In disposing of the case, however, the Court determined that Relford's offense was service connected and accordingly did not reach the retroactivity question. Relford v. Commandant, 401 U.S. 355, 369, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

The United States Court of Military Appeals, the court of last resort for direct review of courts-martial convictions, see 10 U.S.C. § 867, has applied O'Callahan to all cases subject to direct review on the date of that decision. E. g., United States v. Borys, 18 U.S.C.M.A. 259 (1969); United States v. Prather, 18 U.S.C.M.A. 560 (1969).

2. The maximum punishment for two weeks unauthorized absence—the offense which admittedly was service connected within the meaning of O'Callahan—was only six months' confinement, loss of pay and allowances, reduction to the lowest enlisted pay grade and a bad conduct discharge.

3. Flemings served twenty-six months in prison and was dishonorably discharged on October 23, 1946.

4. The action was stayed while Flemings exhausted his administrative remedies. Flemings's applications for correction of his military records were denied by the Judge Advocate General and the Board for Correction of Naval Records, respectively, on May 21 and 24, 1971.

546

considered opinion, decided that the theft of the automobile by Flemings [5] was not service connected and that the conviction for that offense was void under *O'Callahan* because the court-martial lacked subject matter jurisdiction. He remanded the case to the Board for Correction of Naval Records with instructions to vacate the conviction and the dishonorable discharge and to enter a discharge no worse than bad conduct.[6] 330 F.Supp. 193 (E.D.N.Y.1971). From this determination the government appealed. We affirm the district court.[7]

## I.

The threshold question is whether the offense of stealing a privately owned automobile, not being utilized for military purposes, while it was parked on a Trenton, New Jersey street, was "service connected." In *O'Callahan* the Court was faced with harmonizing the constitutional power of Congress to make "Rules for the Government and Regulation of the land and naval Forces," Art. I, § 8, cl. 14, with the constitutional guarantees of an indictment by a grand jury [8] and a trial by a jury of one's peers.[9] The Court recognized that "the exigencies of military discipline require the existence of a special system of military courts in which not all of the specific procedural protections deemed essential in Art. III trials need apply," 395 U.S. at 261, 89 S.Ct. at 1685, but added emphatically that Article I, section 8, clause 14, read in conjunction with the "necessary and

---

5. It is of some interest that Flemings alleged before Judge Weinstein that he was innocent of the charge of auto theft. He claimed that another sailor picked him up while he was hitchhiking and that he never had knowledge that the automobile had been stolen. The sailor, according to Flemings, had left the car for a short while to visit a friend and fled when he saw the State Troopers arresting Flemings.

6. There is no claim that the conviction for being AWOL, which carried with it a potential bad conduct discharge, is invalid.

7. Other courts which have considered the question presented to us have held that courts-martial convictions for non-service connected offenses which became final before June 2, 1969, are not subject to collateral attack under *O'Callahan*. Gosa v. Mayden, 450 F.2d 753 (5th Cir. 1971); Schlomann v. Moseley, 457 F.2d 1223 (10th Cir. Mar. 24, 1972); Thompson v. Parker, 308 F.Supp. 904 (M.D.Pa.), appeal dismissed No. 18, 868 (3d Cir. April 24, 1970); Mercer v. Dillon, 19 U.S. C.M.A. 264 (1970).

The following commentators have predicted or favored retroactivity: Blumenfeld, Retroactivity After O'Callahan: An Analytical and Statistical Approach, 60 Geo.L.J. 551 (1972); Wilkinson, The Narrowing Scope of Court-Martial Jurisdiction: O'Callahan v. Parker, 9 Washburn, L.J. 193 (1970); Note, O'Callahan v. Parker, A Military Jurisdictional Dilemma, 22 Baylor L.Rev. 64 (1970); Note, Denial of Military Jurisdiction over Servicemen's Crimes Having No Military Significance and Cognizable in Civilian Courts, 64 Nw.U.L.Rev. 930 (1970).

Nelson and Westbrook, Court-Martial Jurisdiction Over Servicemen for "Civilian" Offenses: An Analysis of O'Callahan v. Parker, 54 Minn.L.Rev. 1 (1969); Note, 44 Tulane L.Rev. 417, 424 (1970), do not favor retroactivity.

For a compilation of general commentaries on *O'Callahan*, see Relford v. Commandant, 401 U.S. 355, 356 n. 1, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

8. The fifth amendment provides in part: No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; . . .
The phrase "when in actual service in time of war or public danger" modifies only "Militia." *See, e. g.,* Johnson v. Sayre, 158 U.S. 109, 114, 15 S.Ct. 773, 775, 39 L.Ed. 914 (1895).

9. Article III, section 2, clause 3 provides: The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.
The sixth amendment provides in part: In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, . .

proper" clause,[10] authorizes Congress only to invest military courts with " ' "*the least possible power adequate to the end proposed.*" ' " *Id.*, at 265, 89 S.Ct. at 1687, quoting United States ex rel. Toth v. Quarles, 350 U.S. 11, 23, 76 S.Ct. 1, 100 L.Ed. 8 (1955), quoting Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (1821). Article I is a narrow concession to military need, not to be read expansively as licensing broad-based exceptions to the protective benefits afforded by civilian trials.

Accordingly, the Court held that the military status of the defendant was not *ipso facto* sufficient to establish court-martial jurisdiction. It instructed that the nature, the time and the place of the offense must be "service connected," thereby posing a threat to the "special needs of the military." But words, even in their literal sense, frequently require further elucidation. Thus, two years later, in Relford v. Commandant, 401 U.S. 355, 365, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), the Court enumerated the eleven factors which led it to conclude that O'Callahan, who was charged with assault and attempted rape while on an evening pass from his army post in Hawaii, was not properly court-martialed:

1. The serviceman's proper absence from the base.

2. The crime's commission away from the base.

3. Its commission at a place not under military control.

4. Its commission within our territorial limits and not in an occupied zone of a foreign country.

5. Its commission in peacetime and its being unrelated to authority stemming from the war power.

6. The absence of any connection between the defendant's military duties and the crime.

7. The victim's not being engaged in the performance of any duty relating to the military.

8. The presence and availability of a civilian court in which the case can be prosecuted.

9. The absence of any flouting of military authority.

10. The absence of any threat to a military post.

11. The absence of any violation of military property.

*Relford* listed a twelfth factor implicit in the eleven considered in *O'Callahan*— "The offense's being among those traditionally prosecuted in civilian courts."

Clearly, each case must be approached *ad hoc* in light of the many factors to be considered. *Id.* at 365–366, 91 S.Ct. 649. But the balance must be struck on qualitative as well as quantitative grounds. Relford, for example, was charged with the rape of a girl and a woman on the Fort Dix, New Jersey, military reservation. The fourteen year old girl, a sister of a serviceman stationed at Fort Dix, was abducted at the point of a knife while waiting for her brother on a base parking lot; the woman, who worked as a waitress at the post exchange and was the wife of an Air Force man stationed at the adjacent McGuire Air Force Base, was driving to work when she too was abducted at the point of a knife and then raped at the fort's training area. Consideration of factors 4, 6, 8, 11 and 12 and perhaps 5 and 9 weighed against court-martial jurisdiction, while factors 1, 2, 3, 7 and 10 supported jurisdiction. *Id.* at 366, 91 S.Ct. 649. The court-martial conviction was sustained, Justice Blackmun stating for the court "that when a serviceman is charged with an offense committed within or at the geographical boundary of a military post and violative of the security of a person or of property there, that offense may be tried by a court-martial." *Id.* at 369, 91 S.Ct. at 657.

10. Article I, section 8, clause 18 empowers Congress "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, . . ."

In the case before us, it would appear that only factors 1 and 5 support court-martial jurisdiction: Flemings was AWOL, and in 1944 the United States was engaged in World War II. Accordingly, the government argues that the confluence of these two factors was sufficient to sustain court-martial jurisdiction. We do not agree.

The United States Court of Military Appeals, in considering this question, has instructed that AWOL status *ipso facto* will not confer court-martial jurisdiction over a civilian offense committed while AWOL. *See, e. g.,* United States v. Armes, 19 U.S.C.M.A. 15 (1969) (no jurisdiction where defendant stole a car while AWOL).[11] We are not to be understood, however, as suggesting that an unauthorized absence is not a more serious breach of military duty and a greater threat to military discipline during wartime than in peacetime. No court has ever challenged the power of the military to deal swiftly with that offense, and, in doing so, to consider the relative threat it posed to the military's mission. Because the military can protect its special needs by asserting court-martial jurisdiction over the purely military offense of being AWOL, it is inappropriate for it to urge that the "paramount" nature of military discipline during wartime justifies it in sweeping within the jurisdiction any offense committed by a serviceman—no matter where—even when that offense by itself has no inherent relationship to the war effort and in no way hinders that effort.

Flemings's offense was not committed on a military installation nor was it violative of a person or of property located there, as in *Relford*. Although the car Flemings allegedly stole while it was parked on a street in Trenton belonged to a member of the Signal Corps, that fact was a "happenstance" with "no military significance." *Id.* at 16. The government does not suggest that the theft interfered in any way with the owner performing his military duties.[12]

We conclude that under these circumstances the fact that this car theft occurred during wartime bore no special relevance to military discipline. Accordingly, this factor is deserving of little weight under the *Relford* equation. The other circumstances tilt the *Relford* scale heavily in favor of our conclusion that the auto theft was not service connected: one, the crime, traditionally prosecuted by civilian authorities, was not committed on a military installation or in an area subject to military control; two, neither the defendant nor the victim were engaged in military duties at the time of the crime; three, there was no threat to the security of a military post or violation of military property and no direct flouting of military authority; and finally, the civilian courts were open and readily available in 1944 to prosecute the offense. Under these circumstances, we do not perceive any special needs of military discipline which justified encroaching on the benefits of civilian trial and the guarantees of Article III and the fifth and sixth amendments.

11. *Armes* is strikingly similar to this case. Armes, while AWOL (but wearing his fatigue uniform), stole the car of a retired Army major. It should be noted that *Relford* did not enumerate as a relevant factor that the serviceman was in or out of uniform. The Military Court of Appeals has considered the wearing of a uniform relevant to court-martial jurisdiction only where the uniform facilitated the crime. *See, e. g.,* United States v. Peak, 19 U.S.C.M.A. 19 (1969); United States v. Morisseau, 19 U.S.C.M.A. 17 (1969). In any event, Flemings has alleged that he left Fort Dix in civilian clothes and did not wear his uniform again until after he was arrested.

12. The argument has been made that detention and prosecution by state authorities might have prevented Flemings from being present to perform *his* military duties, *see* O'Callahan v. Parker, 395 U.S. at 282–283, 89 S.Ct. 1683 (Harlan, J. dissenting), but the evidence does not indicate that Flemings was in any way indispensable to his unit, and the government's conduct in transferring Flemings to Hart Island makes clear that his contribution to the war effort was not required.

## II.

We turn now to a consideration of the more difficult question presented— whether O'Callahan v. Parker, *supra,* should be applied retrospectively.

Until its decision in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Supreme Court "without discussion, [had] applied new constitutional rules to cases finalized before the promulgation of the rule." *Id.* at 628, 85 S.Ct. at 1737. But, commencing with *Linkletter,* which decided that Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961),[13] would not apply to cases which had become final before the decision in *Mapp* was filed, the Court has applied a three-pronged interest balancing test in deciding whether *new pronouncements of criminal procedure* will be applied retroactively or only prospectively.[14] We emphasize that this new approach has been applied only to cases establishing new rules of criminal procedure. *See* Adams v. Illinois, 405 U.S. 278, 92 S.Ct. 916, 31 L.Ed.2d 202 (Mar. 6, 1972). The classic statement of the test appeared in Justice Brennan's opinion in Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967):

> The criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.

The government, relying heavily on the decision of the Fifth Circuit in Gosa v. Mayden, 450 F.2d 753, 758 (5th Cir. 1971), argues that the retroactivity *vel non* of O'Callahan should be scrutinized under *Linkletter* and its progeny notwithstanding that the result in O'Calla-

*han* turned on the lack of subject matter jurisdiction and not a new rule of criminal procedure.

### A. *The Rationale of O'Callahan—Jurisdiction*

The rationale of *O'Callahan* was founded on the concept of jurisdictional power in the traditional sense and not on functional or procedural deficiencies which are considered an abuse of properly vested adjudicatory power. *See* Gosa v. Mayden, 450 F.2d at 756–757; Schlomann v. Mosley, 457 F.2d 1223 (10th Cir. Mar. 24, 1972); United States ex rel. Flemings v. Chafee, D.C., 330 F.Supp. 193 at 195–197; Note, The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 212 (1969); *but see* Mercer v. Dillon, 19 U.S.C.M.A. 264 (1970). As we discussed at the outset, the court in *O'Callahan* sought to define what offenses Congress, without exceeding the constitutional limits of Article I, section 8, could authorize the military to try by court-martial. The court stated its holding unequivocally in terms of "jurisdiction" in the traditional sense: "We have concluded that the crime to be under *military jurisdiction* must be service connected. . . ." 395 U.S. at 272, 89 S.Ct. at 1690 (emphasis added). If the Court's opinion leaves any doubt as to its meaning, and we do not believe it does, it is obviated by Mr. Justice Harlan's dissent which succinctly framed the issue confronted by the Court as one of "subject-matter jurisdiction of courts-martial." *Id.* at 276, 89 S.Ct. at 1692.

The Court stressed the procedural differences between the operation of Article III courts and courts-martial to emphasize that an unwarranted extension of court-martial jurisdiction would encroach on the fundamental constitutional rights of grand jury indictment and trial by

13. *Mapp,* overruling Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), held that the due process clause of the fourteenth amendment required state courts to exclude evidence seized in violation of the search and seizure provisions of the fourth amendment.

14. The Supreme Court cases applying the *Linkletter* doctrine, excluding those cases decided during the latter part of the 1970 Term, are catalogued in the appendix to the opinion of our venerable brother, Judge Medina, in United States v. Liguori, 438 F.2d 663, 670–676 (2d Cir. 1971).

petit jury—which Justice Douglas, writing for the Court, referred to as the "constitutional stakes" of the litigation. *Id.* 262, 89 S.Ct. 1683. In construing the decision, it is important to note that the Court did not in any sense "reform" court-martial procedures or suggest that current procedures are inadequate in trials for offenses which are service connected. Nor did the Court suggest that courts-martial constitutionally could assume jurisdiction over offenses which are not service connected if they provided the protective benefits of grand jury indictment and trial by jury. Thus, we see no basis for concluding that this case fits within the same mold as *Mapp* and others where convictions were overturned not because the trial court lacked adjudicatory power, but because procedures were constitutionally defective and thus merely an abuse of properly vested adjudicatory power.

### B. *Retroactivity and Jurisdictional Defect*

The important question we must resolve cannot be considered without reference to the rich history elucidating the effect of an unconstitutional law. Almost 100 years ago, in Ex parte Siebold, 100 U.S. 371, 376–377, 25 L.Ed. 717 (1879), the Supreme Court stated that "[a]n unconstitutional law is void, and is as no law. An offense created by it is not a crime. A conviction under it is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment." *See also* Norton v. Shelby County, 118 U.S. 425, 442, 6 S.Ct. 1121, 30 L.Ed. 178 (1886); Chicago, I. & L. Ry. v. Hackett, 228 U.S. 559, 566, 33 S. Ct. 581, 57 L.Ed. 966 (1913). This doctrine—that convictions rendered by a court lacking either personal or subject matter jurisdictions are void—has been a fundamental part of our common law

jurisprudence. Accordingly, even at a time when issues cognizable in habeas corpus proceedings were severely limited, civilian courts exercised collateral review of courts-martial convictions where lack of jurisdiction was alleged. *See* McClaughry v. Deming, 186 U.S. 49, 22 S.Ct. 786, 46 L.Ed. 1049 (1902); Ex parte Reed, 100 U.S. 13, 25 L.Ed. 538 (1879), Note, Developments in the Law-Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1209 (1970).

We are not suggesting for a moment that courts-martial are a modern-day Star Chamber or no more than sophisticated kangaroo courts, but we assert confidently that trial in an Article III court is "implicit in the concept of ordered liberty." Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937) (Cardozo, J.). Courts-martial, however, which derive their power from the congressional authority reposed in Article I, section 8, clause 14, are the fulcrum of "a system of military justice with fundamental differences from the practices in the civilian courts." O'Callahan v. Parker, 395 U.S. at 262, 89 S.Ct. at 1685. Thus, when military jurisdiction exceeds its "proper domain," *id.* at 265, 89 S.Ct. 1683, it treads on the command that *no person* shall be deprived of life, liberty or property without due process of law, albeit that its procedures may not shock our conscience.[15]

In our view, the recent Supreme Court cases denying retrospective application to new rules of criminal procedure where, and only where, as we shall see below, the old rules did not threaten the basic integrity of the court's truth determining process, are not compelling precedent when applied to a case founded on an absence of jurisdiction or power over the subject or person. Not one of the cases establishing a new principle which was limited to prospective application in-

---

15. The grant of power in clause 14 is basically a response to the abuses of royal prerogative, or, in our frame of reference, the potential of unbridled executive discretion. That the Constitution shifted the focus of control from the executive to the legislative branch does not mean that "Congress might legislate at will with regard to members of the armed forces." Duke and Vogel, The Constitution and the Standing Army: Another Problem of Court-Martial Jurisdiction, 13 Vand.L. Rev. 435, 447–449 (1960).

volved a total absence of adjudicatory power. Moreover, if some decisions which were not based upon concepts of jurisdictional competence have been applied retroactively, *see, e. g.*, Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed. 2d 1100 (1968), *a fortiori* a case which rests on lack of jurisdiction in the traditional sense and seeks to preserve the basic integrity of the institutions which enforce our criminal laws, must be so applied. *See* United States v. United States Coin & Currency, 401 U.S. 715, 724, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971) (Harlan, J.).

The government argues that the *Linkletter* line of decisions must be read in light of Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940), and that when so done, authority exists for denying retroactive effect to *O'Callahan*. In *Chicot*, bondholders of a state drainage district who had been parties to a debt readjustment proceeding under a federal statute sought to recover on the original bonds, alleging that the debt readjustment was invalid because the statute subsequently had been declared unconstitutional. The Supreme Court recognized that the court which decreed the readjustment did not have subject matter jurisdiction, but nevertheless applied the doctrine of *res judicata* in denying the bondholders relief. *Chicot*, however, was not a criminal case, nor was it concerned with the liberty or the fundamental rights to a fair trial. *See generally* Note, Prospective Operation of Decisions Holding Statutes Unconstitutional or Overruling Prior Decisions, 60 Harv.L. Rev. 437, 446–448 (1947). *But cf.* Warring v. Colpoys, 74 App.D.C. 303, 122 F.2d 642, cert. denied, 314 U.S. 678, 62 S.Ct. 184, 86 L.Ed. 543 (1941). *Chicot* was a civil proceeding concerned simply with whether a debt was still owing. Although the doctrine of finality bears an important place in the jurisprudence of criminal law, *see* Bator, Finality in Criminal Law and Federal Habeas Cor-

pus, 76 Harv.L.Rev. 441 (1963), it is "more firmly settled in the context of civil litigation." Mishkin, The Supreme Court, 1964 Term—Foreword: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv. L.Rev. 56, 77 (1965). The primary function of habeas corpus is "to secure individual freedom from unjustified confinement," even though the petitioner may be confined pursuant to a final judgment. *Id.* at 79. Moreover, *Chicot* involved vested rights of third parties who, relying in good faith on the seeming validity of the Court's decree readjusting the debt, purchased new bonds. It would have been strikingly unjust to deprive these third parties of vested rights when the original bondholders had failed to raise any constitutional objections during the readjustment proceedings and before the rights had vested.

The recent decision in United States v. United States Coin & Currency, *supra*, buttresses our conclusion that *Chicot* should not be transported ipse dixit to the arena of criminal litigation. *Coin* involved an action by the government for forfeiture of money allegedly used in illegal bookmaking operations. *See* 26 U.S.C. § 7302. Subsequently, the Supreme Court voided the Internal Revenue laws which were the basis of the forfeiture proceeding. Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L. Ed.2d 889 (1968); Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). The government urged that *Marchetti* and *Grosso* should not be given retroactive application because an overwhelming number of suits would be commenced by gamblers who had been subjected to forfeitures in earlier proceedings and would now seek to reclaim their property. In rejecting this contention, Justice Harlan, in a characteristically scholarly opinion, adhered rigidly and categorically to the concept that judgments of a court without subject matter jurisdiction were void. 401 U.S. at 723–724, 91 S.Ct. 1041.

We draw further support from North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct.

2072, 23 L.Ed.2d 656 (1969). The Court decided *inter alia,* that Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), which held that the fifth amendment guaranty against double jeopardy is enforceable against the states, would apply retroactively. *Benton,* we note, is similar to *O'Callahan* in that Benton's conviction was overturned because, under the double jeopardy clause, he should not have been retried. Accordingly, the trial court was devoid of subject matter jurisdiction. Although *Linkletter* had been decided more than four years before, and the doctrine of prospective limitation had become a familiar tool of appellate decision, it was so clear to the *Pearce* Court that *Benton* should be applied retroactively that it did not even discuss the application of *Linkletter.*

### III.

■ Although we conclude that *O'Callahan* must be applied retroactively because that decision was grounded in the absence of jurisdiction to adjudicate, we feel obliged to indicate that our application of the *Linkletter* doctrine to *O'Callahan* also would lead us to conclude, unlike other courts,[16] that *O'Callahan* must be applied retroactively.

### A. *The Purpose to be Served*

The initial and most crucial question to be asked in deciding whether a new ruling is to be applied retroactively is what purpose or objective was to be achieved by the new standard. *See, e. g.,* Williams v. United States, 401 U.S. 646, 653, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971) (opinion of White, J.). The underlying goal of Mapp v. Ohio, for example, was to deter state authorities from conducting illegal searches and seizures by imposing the sanction of excluding the evidence seized. This principal purpose—future deterrence—would not have been enhanced by overturning past convictions based on illegally seized evidence. The

end to be served by *O'Callahan,* however, was to afford a serviceman charged with a non-service connected crime committed off-post with at least the benefits of grand jury indictment and trial by petit jury before he could be deprived of his liberty or property. Retroactivity achieves this objective.

But, that does not end our inquiry, for even if a new standard is designed to insure the fairness of a trial and preserve the integrity of the fact-finding process, it does not follow that it will be applied retroactively if the old standard did not present a "clear danger of convicting the innocent." Tehan v. United States ex rel. Shott, 382 U.S. 406, 416, 86 S.Ct. 459, 465, 15 L.Ed.2d 453 (1966).[17] The courts that have concluded that *O'Callahan* should not be applied retroactively have relied heavily on De Stefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968), which considered the retroactivity of Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), and Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968). *Duncan* applied the sixth amendment to the states through the fourteenth amendment and required the states to provide jury trials in serious criminal cases; *Bloom* extended the right to jury trial to state trials for serious criminal contempt. *De Stefano,* although recognizing retrial for those who had been subjected to the procedures now declared unconstitutional would afford them the coveted right to a jury trial, decided against retroactive application. After quoting from *Duncan:*

> We would not assert, however, that every criminal trial—or any particular trial—held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury,

the Court concluded:

> The values implemented by the right to jury trial would not measurably be

---

16. *See* note 7 *supra.*

17. This assumes, of course, that there was justifiable reliance on the old standard

and that retroactive application would adversely affect the administration of justice.

served by requiring retrial of all persons convicted in the past by procedures not consistent with the Sixth Amendment right to jury trial.

392 U.S. at 634, 88 S.Ct. at 2095.

Although the basic values served by the decisions in *Duncan* and *Bloom*, and in *O'Callahan* are similar, the Supreme Court instructed in Johnson v. New Jersey, 384 U.S. 719, 728–729, 86 S.Ct. 1772, 1778, 16 L.Ed.2d 882 (1966), "whether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial is necessarily a matter of degree." The facts and *ratio decidendi* of *O'Callahan* undermine any compelling analogy between this case and *De Stefano*.

Justice Douglas, writing for the majority in *O'Callahan*, quoted extensively from United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955), which decided that a serviceman could not be subjected to court-martial after he had been discharged. Particularly pertinent was the Court's observation in *Toth* "that military tribunals have not been and probably never can be constituted in such a way that they can have the same kind of qualifications that the Constitution has deemed essential to fair trials of civilians in federal courts." *Id.* at 17, 76 S.Ct. at 5. A brief overview of some of the procedures applicable when Flemings was court-martialed will reveal that this statement is not to be taken with a grain of sand or as evidencing a mere "belief that a civilian court trial with grand and petit jury protections would tend to prevent arbitrariness and repression and be fairer." Gosa v. Mayden, 450 F.2d at 765. Indeed, Justice Douglas's appraisal was based on the procedures afforded after the Uniform Code of Military Justice was adopted in 1950. 10 U.S.C. § 800 et seq. We need not speculate as to how much greater the discrepancy must have been between Article III courts and courts-martial be-

fore its adoption.[18] But, Senator Ervin of North Carolina was moved to comment:

> Prior to 1950 the American in uniform had been at the mercy of legal procedures little changed since before the Revolutionary War, procedures originally designed for mercenaries—not for citizen soldiers loath to give up the rights they were defending. So antiquated and unjust was the system that after World War II a great protest came from returning veterans demanding reforms which would guarantee to servicemen basic principles of due process of law.

115 Cong.Rec. S 6760–61 (Daily ed. June 19, 1969).

At the time of Flemings's court-martial the fact-finding body consisted of a panel of officers hand-picked by the officer convening the court-martial. Since this officer normally had direct command authority over the members of the panel—who could convict by a bare majority—it is realistic to assume that there was an ever-present danger of command influence. *See* O'Callahan v. Parker, 395 U.S. at 264 & n. 5, 89 S.Ct. 1683, 23 L.Ed.2d 291. Each member took his place, heard the evidence, and rendered his opinion, fully aware of the implications inherent where the commanding officer convened the court and selected its members and the counsel on both sides. Moreover, the pervasive atmosphere of the court-martial process was the "age-old manifest destiny of retributive justice." *Id.* at 266, 89 S.Ct. at 1687.

The relative deficiencies of Flemings's court-martial procedures were not limited to the reliability of the fact finder. The record in this case reveals that Flemings was represented by "counsel." But, under regulations applicable in 1944, "counsel" was an officer assigned to assist the accused; there was no require-

18. In some respects many court-martial procedures now compare favorably with practices in civilian courts. *See generally*

Quinn, Some Comparisons Between Courts-Martial and Civil Practice, 15 U.C. L.A. L.Rev. 1240 (1968).

ment that he have legal training.[19] In addition, the right to compulsory process for obtaining evidence and witnesses was, to a significant extent, dependent on the approval of the prosecution. *Id.* at 264 n. 4, 89 S.Ct. 1683. This limitation could be particularly devastating to the defense, because courts-martial often were not convened in the vicinage where the alleged offense was committed.[20] Flemings, for example, was court-martialed at the Brooklyn Navy Yard in Brooklyn, New York, although the car was stolen in Trenton, New Jersey, and he was arrested near Hollidaysburg, Pennsylvania. Any likely witnesses, therefore, were located in New Jersey or Pennsylvania. Clearly, the procedures were not conducive to the effective presentation of a defense.[21]

The obvious conclusion, and one warranted by the Court's thorough discussion in *O'Callahan* and *Toth*, is that the court-martial procedures employed there raised a "clear danger of convicting the innocent." Tehan v. United States ex rel. Shott, 382 U.S. at 416, 86 S.Ct. at 465. Justice White's discussion of the *Linkletter* line of decisions sets forth the rationale in pithy fashion:

> Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial which substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect. Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances. Williams v. United States, 401 U.S. at 653, 91 S.Ct. at 1152 (footnote omitted).[22]

### B. *Impact of Retroactivity* [23]

We are told that retroactive application of *O'Callahan* may require the

---

19. Naval Courts and Boards, Ch. IV, § 358 (1937). We note that the right to appointed counsel when one is charged with a serious offense, although applied to the states for the first time in 1963, is considered so fundamental to a fair trial that it has been applied retroactively. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

20. Flemings claims, as a separate ground for relief, that he was denied the right to trial in the vicinage guaranteed by Article III, section 2, clause 3:

> The Trial of all Crimes, except in Cases of Impeachment, shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

In light of our conclusion that *O'Callahan* must be applied retroactively, we do not reach this question.

21. In comparing *O'Callahan* to *Duncan* with respect to *De Stefano* and concluding that it "could not assert that every criminal trial or any particular trial by court-martial is unfair or that an accused may never be as fairly treated by members of a military court as he would by a civilian jury," the Court of Military Appeals noted that in many cases that would be affected by a retroactive application of *O'Callahan*, the accused had pleaded guilty. How could it be argued, it asked, that the accused in such a case had been subjected to an unfair trial on the issue of guilt. Mercer v. Dillon, 19 U.S.C.M.A. at 268. The answer comes quickly that the court-martial procedures we have described certainly would weigh heavily in inducing the accused to plead guilty.

22. See cases cited in Williams v. United States, 401 U.S. at 653 n. 6, 91 S.Ct. 1148, 28 L.Ed.2d 388.

23. Although the history of "reliance" by the military is of some interest, we believe, it would unduly protract this opinion to deal at great length with this element, particularly when that history is so abstruse. Courts-martial have exercised their jurisdiction over so-called "civilian" crimes pursuant to congressional authorization since 1916. Act of August 29, 1916, Ch. 418 § 1342, 39 Stat. 650; *see* *Duke* and *Vogel, supra,* 13 Vand.L.Rev. at 449–453. Although this jurisdiction was not supported by any prior holding of the Supreme Court, language in several cases supports an inference that mere military status was sufficient to permit trial by court-martial. *See, e. g., Ex parte*

Armed Forces to vacate thousands of court-martial convictions.[24] Not only will discharge records have to be changed, but questions of retroactive pay and veterans benefits will be involved. At first blush the administrative burden might appear staggering, but, in actuality, the great bulk of claims will entail routine processing. Each branch of the Armed Services already has a Board for Correction of Military Records, *see* 10 U.S.C. § 1552(a), which has established procedures for handling such claims. It is more significant, however, that very few servicemen have sought collateral review of their convictions under *O'Callahan*. *See* Blumenfeld, Retroactivity After O'Callahan: An Analytical and Statistical Approach, 60 Geo.L.J. 551, 578 & n. 141. The burden would be reduced further, as Judge Weinstein suggested in his opinion below, if Congress were to adopt a short statute of limitations for those who would apply for retroactive benefits.

Nor do we envision a significant impact on the administration of justice. Federal courts may be called upon where a serviceman has been denied an administrative remedy on the ground that his offense was service connected. Although *O'Callahan* gave little guidance on this question, *Relford*, while adhering to an *ad hoc* approach, indicates that the single most important factor will be whether the offense occurred on base. We would expect that a large number of cases will be easily disposed of under this standard.

*O'Callahan*, decided more than two years ago, has yet to stir an influx of litigation which threatens to overwhelm the floodgates.

### IV.

We cannot conclude without discussing the far-reaching institutional considerations which govern and reinforce our conclusion that *O'Callahan* must be applied retroactively. The litany that judicial decisions must be so applied, traceable to Blackstonian concepts, is firmly embedded in the development of our common law jurisprudence. *See generally* Mishkin, *supra*, 79 Harv.L.Rev. at 58–76. Although *Linkletter* departed from this norm, it did so only "in the interest of justice." 381 U.S. 618 at 628, 85 S.Ct. 1731. Nevertheless, the Court did apply the exclusionary rule of Mapp v. Ohio to Mrs. Mapp herself and to all cases pending on direct review at the time of the decision, even though to do so did not foster the primary purpose of *Mapp*— to deter future searches and seizures in violation of the fourth amendment. With the passage of time, the Court hesitated to apply new decisions even to cases on

Milligan, 71 U.S. (4 Wall.) 2, 123 (1866); Coleman v. Tennessee, 97 U.S. 509, 24 L.Ed. 1118 (1878); Smith v. Whitney, 116 U.S. 167, 184–185, 6 S.Ct. 570, 29 L. Ed. 601 (1886); Johnson v. Sayre, 158 U. S. 109, 114, 15 S.Ct. 773, 39 L.Ed. 914 (1895); Grafton v. United States, 206 U.S. 333, 348, 27 S.Ct. 749, 51 L.Ed. 1084 (1907); Reid v. Covert, 354 U.S. 1, 22–23, 77 S.Ct. 1222, 1 L.Ed.2d 1148; Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 240–243, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960).

Nevertheless, a line of Supreme Court cases steadily had narrowed the permissible limits of court-martial jurisdiction from jurisdiction over civilians bearing a remote relationship to the Services to jurisdiction over those actually serving. These cases emphasized the same consitutional considerations which led the *O'Callahan* Court to the service-connection

test. *See, e. g.,* United States ex rel. Toth v. Quarles, *supra* (discharged servicemen cannot be court-martialed); Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (civilian employees of military personnel accompanying them overseas cannot be court-martialed); McElroy v. United States ex rel. Guagliardo, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1970) (civilian employees of Armed Forces overseas not subject to court-martial). Since *O'Callahan* was not an abrupt change of direction for the Court, but a marked extension of a discernible trend, its coming "was clearly prophesied, if one had the ears to hear and the eyes to read." Mercer v. Dillon, 19 U.S.C.M.A. at 273 (Ferguson, J., dissenting).

24. See the statistics collected in Blumenfeld, *supra*, 60 Geo.L.J. at 578–581.

direct review. For example, the principles of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were applied only to trials commenced after the dates of those decisions. Johnson v. New Jersey, 384 U.S. 719, 733, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Justice Harlan has forcefully characterized this as "[s]imply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule. . . ." Mackey v. United States, 401 U.S. 667, 679, 91 S.Ct. 1171, 1173, 28 L.Ed.2d 404 (1971).

Whether or not one agrees with Justice Harlan's view that this is "an indefensible departure from [the time-worn] model of judicial review," id., or with Justice Douglas that it is "inherently invidious," Adams v. Illinois, 405 U.S. 278, 92 S.Ct. 916, 31 L.Ed.2d 202 (dissenting), the evils would be all the more apparent and the injustices all the more pronounced if the Court were to snare one case (O'Callahan's) from the realm of finality, relieve the petitioner of a claimed and now recognized injustice, but relegate all others subject to the same injustice to the fate of not having been the lucky chosen one. That is what the government now urges. We must remember that it was in a habeas corpus proceeding that the Supreme Court in O'Callahan afforded relief from a final conviction.

To our knowledge, the Supreme Court always has applied new rules announced in habeas corpus cases retroactively. See, e. g., Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). This is hardly surprising, however, for the reason lies in the very function of the writ as explained by Justice Brennan in the landmark decision of Fay v. Noia,

372 U.S. 391, 401–402, 83 S.Ct. 822, 828, 9 L.Ed.2d 837 (1963):

Although in form the Great Writ is simply a mode of procedure, its history is inextricably intertwined with the growth of fundamental rights of personal liberty. For its function has been to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints.

There is no indication whatsoever that in deciding to grant O'Callahan's petition the Supreme Court intended to depart from the traditional concept of the Great Writ. The identical principles which were at stake in *O'Callahan* and motivated the Court to grant collateral relief compel us to hold that Flemings is entitled to the same collateral relief.

Finally, we reiterate that we are not concerned here merely with defects in the procedures employed at Flemings's court-martial, but as the *ratio decidendi* of *O'Callahan* made clear, with the total absence of power to judge him.

The Court is grateful to Michael Meltsner, Esq., who, as assigned counsel, represented appellee with skill.

Judgment affirmed.