**Marcus A. MARYMONT, Petitioner,**

**v.**

**L. A. JOYCE, United States Probation and Parole Officer, Western District of Arkansas, Respondent.**

**No. H–70–C–6.**

United States District Court,
W. D. Arkansas,
Harrison Division.

Dec. 29, 1972.

Thomas B. Tinnon, Mountain Home, Ark., for petitioner.

Bethel B. Larey, U. S. Atty., and Sam Hugh Park, Asst. U. S. Atty., Western District of Arkansas, Fort Smith, Ark., for respondent.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

This is a habeas corpus proceeding brought by Marcus A. Marymont of Mountain Home, Arkansas, against L. A. Joyce, one of the United States Probation and Parole Officers for the Western District of Arkansas. Petitioner seeks to vitiate his 1958 conviction of first degree murder by a United States Air Force general court martial sitting in England. Petitioner is presently at large on parole, and is subject to the supervision of respondent.

The case has been submitted on the pleadings, the oral testimony of petitioner, voluminous documentary material, and memorandum briefs.

In 1958 petitioner was a career enlisted man in the Air Force and had attained the rank of Master Sergeant. He was stationed at a Royal Air Force Base at Sculthorpe, England, and was assigned to intelligence duties. He was a married man and had three children of varying ages. For a substantial period of time prior to June 8, 1958, petitioner had been carrying on a love affair with a married woman who was a British subject. The existence of this affair was known to petitioner's wife, and it had caused them to become estranged although they did not obtain a divorce and continued to live together. The affair's existence was also known to others who were acquainted with petitioner and his wife.

On the evening of June 8 petitioner's wife became violently ill, and she died in a hospital on June 9. An investigation of her death led to a finding that she had been the victim of arsenical poisoning, and in the fall of 1958 petitioner was charged with murder under the provisions of Punitive Article 118 of the Uniform Code of Military Justice, 10 U. S.C.A., section 918. He was contemporaneously charged with adultery under the provisions of Punitive Article 134, 10 U.S.C.A., section 934.[1]

The two charges were tried together, and petitioner was found guilty of both. On the murder charge he was sentenced to life imprisonment, and to the forfeiture of all pay and allowances, and to be dishonorably discharged from the service. The verdict of the court martial was considered exhaustively by an Air Force Board of Review which affirmed both convictions. An appeal to the Court of Military Appeals was allowed. That Court affirmed the murder convic-

1. Article 134 is entitled "General Article," and is as follows: "Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court." The Court is not advised as to whether adultery is a crime in England; murder, of course, is a crime in that country just as it is here.

tion but set aside the conviction of adultery on the ground that certain evidence had been admitted improperly. United States v. Marymont, 1960, 11 USCMA 745, 29 CMR 561.

Petitioner was returned to this country and was confined until 1967 in the United States Disciplinary Barracks at Fort Leavenworth, Kansas. In that year he was paroled and came to Arkansas where he has since resided. Since his parole his sentence has been reduced substantially on at least three separate occasions and will expire within a comparatively short time. However, that fact is not material, nor is the fact that petitioner is physically at liberty on parole. Federal subject matter jurisdiction is established. 28 U.S.C.A., § 2241; Relford v. Commandant, 1971, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102; Levy v. Parker, 1969, 396 U.S. 1204, 90 S.Ct. 1, 24 L.Ed.2d 25; O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291; Carafas v. LaVallee, 1968, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554; Harris v. Ciccone, 8 Cir., 1969, 417 F.2d 479.

Petitioner contends here that the court martial had no jurisdiction to try him because his alleged offense was not "service connected," that he was entitled to be tried before a jury in a civil court in England, and that Air Force investigators obtained evidence from him without adequate compliance with the warnings requirement of Article 31 of the Uniform Code, 10 U.S.C.A., section 831. It is further contended that petitioner was not represented by counsel when he was placed in a line-up by investigating officers.

By way of introduction it should be said that petitioner has always contended steadfastly that he did not kill his wife, but the Court is not concerned in this proceeding with any question of petitioner's substantive guilt or innocence.

The Court is convinced that petitioner's claims are without merit, and that his petition should be dismissed. Some discussion, however, is requisite.

Taking up first the claim that the court martial had no jurisdiction to try petitioner because his alleged crime was not service connected, it may be conceded that had the offense been committed off base within the continental United States or elsewhere within the territorial jurisdiction of this country so that he would have been subject to trial in American civil courts, his trial by court martial would have been unconstitutional under the holding in O'Callahan v. Parker, supra, assuming that that decision is to be given retroactive application.

Whether O'Callahan is to be applied retroactively is a question that has not been finally answered as yet. Retroactive application was refused in Schlomann v. Moseley, 10 Cir., 1972, 457 F.2d 1223, and in Gosa v. Mayden, 5 Cir., 1971, 450 F.2d 753. However, the contrary result was reached in U. S. ex rel. Flemings v. Chafee, 1972, 458 F.2d 544. The Supreme Court has granted certiorari at least in Flemings, 408 U.S. 919, 92 S.Ct. 2492, 33 L.Ed.2d 331, and a notation in 40 USLW 3602 indicates that certiorari has been granted in Gosa as well.

■ The Court finds it unnecessary to decide the question just mentioned because in this case the offense was committed in a foreign nation, and the Court does not consider that O'Callahan is applicable to such a case. Hemphill v. Mosley, 10 Cir., 1971, 443 F.2d 322; Swift v. Commandant, 10 Cir., 1971, 440 F.2d 1074; Gallagher v. United States, 1970, 423 F.2d 1371, 191 Ct.Cl. 546.

■ Passing on to the claim that petitioner should have been tried in a British court to a British jury, it has been noted that murder is a crime in Great Britain, as it is here, and petitioner might well have been turned over to British civil authorities for trial and punishment. However, there was no requirement that such action be taken in view of the provisions of the status of forces agreement that was in force in 1958 and to which the United States and

various other nations, including Great Britain, were parties signatory. North Atlantic Treaty—Status of Forces—June 19, 1951, 4 USTIA, Part 2, pp. 1793 et seq.

As pointed out in Gallagher v. United States, supra, 423 F.2d at 1374, that treaty divides offenses by soldiers in foreign country into three categories. "Those punishable only by the law of the sending state are dealt with by that state. Those punishable only by the law of the receiving state are dealt with by the receiving state. Those punishable by the laws of both states are deemed concurrent, and with exceptions not here pertinent, the receiving state has 'primary jurisdiction in such cases, which it may waive if requested." (Ibid.)

The instant case falls within one of the exceptions to the general rule that where an act is criminal under the law of both the sending state (United States) and the receiving state (Great Britain), the receiving state has primary jurisdiction. Article VII, Section 3 of the treaty is explicit in pertinent part:

"3. In cases where the right to exercise jurisdiction is concurrent the following rules shall apply:

"(a) The military authorities of the sending State shall have the primary right to exercise jurisdiction over a member of a force or of a civilian component in relation to

"(i) . . . offences solely against the person or property of another member of the force or civilian component *or of a dependent.*" (Emphasis added.)

Mrs. Marymont was a dependent of petitioner, and the above quoted portion of Article VII, Section 3 was applicable to the murder charge against petitioner.

On this phase of the case the Court concludes that the court martial had ju-risdiction to try petitioner, that he was not entitled to a civil trial in England, and that his military trial did not by its character deprive petitioner of due process of law. It now becomes necessary to consider petitioner's claim that the military investigators did not comply sufficiently with Article 31 of the Code. Specifically petitioner argues that there was insufficient compliance with Article 31(b) which is as follows:

"(b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial." [2]

Petitioner's Article 31 claim appears to the Court to have two aspects. The first relates to a statement that he gave to interrogating agents on the evening of June 16, 1958, and which was admitted into evidence over objection. The second relates to other information which he gave to the agents between June 16 and July 14, 1958, when the formal pre-trial investigation required by Article 32 of the Code was commenced.

Petitioner was first interviewed by the agents on June 16, and the statement in question, which went into evidence as prosecution's Exhibit 101, was obtained. Thereafter he had several interviews with the agents and supplied them with certain information including an admission that at some time prior to the death of his wife he had visited a certain chemist's shop, to use the British term, where poisons might be obtained by qualified persons.

2. The Code was adopted in 1955 several years before the Supreme Court decided Escobedo v. Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, holding that somewhat more elaborate warnings to suspects or subjects of investigations are constitutionally required.

On this phase of the case petitioner does not contend that the agents did not prior to each interview advise him of his rights under Article 31, or that he did not understand the Article, or that he did not know what his rights were. He simply contends that the agents did not tell him as of June 16 and thereafter that he was affirmatively suspected of having murdered his wife when such was the case. He says, in effect, that he was lulled by alleged representations of the agents that they were merely investigating the circumstances of the death of his wife and needed his cooperation.[3]

The Court does not consider that the Article 31 claim presents any substantial constitutional question open to review in this collateral proceeding.

■ It is well established that Escobedo v. Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, are not to be applied retroactively. While Article 31 is an important procedural safeguard to servicemen who are suspects or accused of crime, its requirements in the Court's estimation did not in 1958 or in years immediately subsequently thereto rise to constitutional dignity. Hence, the improper reception by the court martial of evidence obtained without compliance with the Article would be simply a procedural error which would have to be corrected, if at all, through the military review process.

■ It is important to keep in mind that the scope of review of the decision of a military court by a federal habeas corpus court is narrower than the scope of review in that court that is available where a criminal conviction in a civil court is under attack.

■■ A federal district court has no appellate jurisdiction with respect to the decision of a court martial. While such a court has the power to correct a deprivation of any basic constitutional right by a court martial, nevertheless where a factual determination is involved the inquiry of the court is usually limited to the question of whether the military court gave "full and fair consideration to the constitutional issues." Kennedy v. Commandant, 10 Cir., 1967, 377 F.2d 339, 342, cited in Harris v. Cicone, supra, 417 F.2d at 481. See also Burns v. Wilson, 1953, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508, and United States ex rel. Thompson v. Parker, 3 Cir., 1968, 399 F.2d 774. And, of course, a constitutional question may be waived in the course of a court martial proceeding as well as in a proceeding in a civil court.

■ From the record before it the Court finds that the Article 31 claim of petitioner was presented to and considered by the military to the extent that trial counsel for petitioner saw fit to raise contentions based on that Article, and that contentions that might have been based on Article 31 but were not made were effectively waived and cannot be raised for the first time here.

The Article 31 contention made in the course of the military proceedings seems to have been limited to the admissibility in evidence of Exhibit 101 which has been mentioned, and the objection to that Exhibit seems to have been limited to the adultery phase of the case.

The defendant's statement which became Exhibit 101 amounted to a confession that over a period of time petitioner had been committing adultery, but it was completely exculpatory as far as any possible charge of murder was concerned, except in the sense that it admitted the existence of a motive for murder. Considerable testimony was taken before the Law Officer of the court martial with respect to the voluntariness of the statement and with respect to the compliance by the investigating officers with Article 31. The Law Officer found that there had been compliance with the

---

3. No contention is made that petitioner's statement or any other item of information or evidence supplied by him was obtained by any force, threats, or promises of reward, immunity, or leniency.

Article, that the statement was voluntary, and that it should be received in evidence.

The Board of Review considered the question of the admissibility of the statement in connection with both the adultery charge and the murder charge and concluded that no error was committed when the statement was received. In its opinion the Court of Military Appeals referred to the admissibility of the statement only in connection with the adultery charge, and found it unnecessary to decide the question because it was vacating the adultery conviction on other grounds. It should be pointed out, however, that that Court stated that it had examined the entire record for possible error and had found none.

The solicitude of the Court of Military Appeals for the rights of servicemen entitled to the benefit of Article 31 was referred to in strong terms in Heilman v. United States, 7 Cir., 1969, 406 F.2d 1011, 1013. And this Court is persuaded that the question of compliance with Article 31 in petitioner's case was adequately considered in the overall military process.

Assuming, however, for purposes of discussion that this Court should reexamine the question, the Court finds the claim to be insubstantial factually.

It is true that the military investigators did not tell petitioner in so many words that he was suspected of having murdered his wife, but the Court is convinced that in the circumstances the petitioner must have known that he was at least a potential suspect and that he was in dangerous proximity to a murder charge.

In 1958 petitioner was not an ignorant or naive individual; as stated, he was a Master Sergeant in the Air Force and was assigned to intelligence duty. He knew that he had been carrying on an illicit love affair for a considerable period of time; he knew that his wife had been taken ill suddenly, and that he had been the only adult alone with her during most of her illness. He knew that other people knew about his possible motive for murder. He knew that plans for him to accompany the body of his wife back to the United States for burial had been cancelled, and that he had been directed to return to his base for interrogation and that the body was being held in England. And he knew that arsenic was being mentioned as a possible cause of death. He also knew that his wife's death was being investigated by criminal investigators who apart from suspicion of foul play would have had no interest in making the investigation.

Given those items of knowledge on the part of petitioner, it would be incredibly naive to believe that he, as a man of common sense and experience, would not have foreseen the possibility of a criminal charge being brought against him.

He admits that he was given Article 31 warnings, and that he knew that he did not have to give information to the investigators. He was not coerced. The Court thinks that he simply decided to go along with the investigators and give them a statement admitting the adultery, the fact of which was readily ascertainable otherwise, and other information not necessarily incriminating. If he was innocent, he would have nothing to lose by cooperation. If he was guilty, as subsequently found by the court martial, his cooperation or pretended cooperation might serve to throw the investigators off the scent.[4]

 Petitioner's claim that he was not represented by counsel when he was placed in a line-up for identification requires little discussion. Assuming that the question was not waived in the course of the military proceedings, it is answered by stating that as of the time of the line-up petitioner had no established constitutional right to representation at that stage of the proceedings, and cases like United States v. Wade,

4. In his statement to the investigators petitioner implied the possibility that his wife had committed suicide.

1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed.2d 1149, and Gilbert v. California, 1967, 388 U.S. 263, 87 S.Ct. 1951, 18 L. Ed.2d 1178, are not to be applied retroactively, Stovall v. Denno, 1967, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

An order dismissing the petition will be entered.